FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
FRANCIS A. BOTTINI, JR. (175783)
bottini@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Symphony Towers
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599

Attorneys for Plaintiff Pinchus Berliner

[Additional Counsel Appear On Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re APPLIED MICRO CIRCUITS CORPORATION, INC. DERIVATIVE LITIGATION | ) LEAD CASE NO.  5:06-cv-04269-RS ) ) |
| ———————————————————— | ) **CONSOLIDATED AMENDED** ) **SHAREHOLDER DERIVATIVE** |
| This Document Relates To: | ) **COMPLAINT** ) |
| ALL ACTIONS. | ) ) ) |
| ———————————————————— | ) |

Plaintiffs, by and through their attorneys, derivatively on behalf of Applied Micro Circuits Corporation ("AMCC" or the "Company"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding AMCC as follows:

**SUMMARY**

1.      This is a stockholders' derivative action brought on behalf of Nominal Defendant AMCC against: AMCC's Board of Directors (the "Board"), which includes defendants Cesar Cesaratto ("Cesaratto"), Kambiz Hooshmand ("Hooshmand"), Dr. Murray A. Goldman ("Goldman"), Fred Shlapak ("Shlapak"), Arthur B. Stabenow ("Stabenow"), Julie H. Sullivan ("Sullivan"), Harvey P. White ("White"), David B. Wright ("Wright"), David M. Rickey ("Rickey"), Douglas C. Spreng ("Spreng"), Saiyed Atiq Raza ("Raza"), William K. Bowes ("Bowes"), Robert Clive Ghest ("Ghest"), and Roger A. Smullen ("Smullen") (referred to as the "Director Defendants"); and the Company's former and current top executives, which includes defendants Joel O. Holliday ("Holliday"), Thomas Tullie ("Tullie"), Anil Bedi ("Bedi"), Laszlo Gal ("Gal"), William E. Bendush ("Bendush"), Kenneth L. Clark ("Clark"), Brent E. Little ("Little"), Gregory A. Winner ("Winner"), Ramakrishna R. Sudireddy ("Sudireddy"), Stephen M. Smith ("Smith"), Daryn Lau ("Lau"), Faye W. Pairman ("Pairman"), Brian Wilkie ("Wilkie"), Robert G. Gargus ("Gargus"), and Barbara Murphy ("Murphy") (collectively with Director Defendants Rickey, Spreng, and Hooshmand referred to herein as the "Option Defendants"), collectively "Defendants," by Plaintiffs Pinchus Berliner ("Berliner") and Francesco Ciabatti ("Ciabatti"), collectively "Plaintiffs," who are now, and at relevant times have been, stockholders of AMCC.

2.      This action seeks redress for the harm done to AMCC, and indirectly to its stockholders, resulting from the self-dealing of certain of the Company's top executives, who violated state and federal law, breached their fiduciary duties of loyalty and good faith to the Company by intentionally manipulating their stock option grant dates between 1997 and the

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

present, in order to secure a huge windfall for themselves at the expense of AMCC and by misstating AMCC's financial results from the Company's fiscal year 1998 through the present (the "Relevant Period"). Defendants' misconduct has resulted in the Company's need to restate its financial statements for each of the years ending March 31, 1998 through March 31, 2006, as well as for the first two quarters of fiscal year 2007. AMCC is also unable to file its Annual Report on Form 10-K for the year ending March 31, 2006 and its Quarterly Report on Form 10-Q for the quarter ending June 30, 2006.

3.     These key executives and directors backdated stock option grants in order to exercise the stock option grants at a lower strike price, thus pocketing more money than they were otherwise entitled to receive. According to Professor James Cox of Duke University School of Law, backdating grants is "a very sorry practice" – "[i]t's like letting the CEOs bet on a race when they know who the winner will be."

4.     A stock option granted to an employee or director of the Company allows the employee or director to purchase Company stock at a specified price – referred to as the "exercise price" – for a specified period of time. Stock options are granted as part of an employee's or director's compensation package to create incentives for him or her to boost profitability and the Company's stock value. When an employee or director exercises an option, he or she purchases the stock from the Company at the exercise price, regardless of the stock's price at the time the option is exercised. Option pricing is based on the price of the Company's common stock on the day of the grant.

5.     If an option is backdated to a day on which a market price was lower than the price on the day the option is granted, as AMCC has admitted here, then the employee or director pays less and the Company gets less money for the stock when the option is exercised. AMCC then failed to record the proper non-cash stock based compensation expense, currently estimated to be up to $200 million as of September 2006, and now faces adverse and serious tax and accounting consequences such as restating nine years of financial statements. Furthermore, the purchaser of the option obtains greater compensation than that to which he or she is entitled. Such conduct conflicts with representations made by the Company in its public filings and is unlawful and

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

improper.

6.     On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of Current Issues Regarding Executive Compensation Including Backdating of Stock Options; and Tax Treatment of Executive Compensation, Retirement and Benefits."

7.     At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' … [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. …"

8.     At the Senate Finance Committee Hearing, the Chairman of the SEC, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."

9.     Here, the unlawful conduct occurred while certain Director Defendants were directing the Company. Director Defendants authorized, modified, or failed to halt the backdating of options in dereliction of their fiduciary duties to the Company as directors and/or officers, thus causing or allowing the Company to suffer millions of dollars in harm. Upon information and belief, AMCC insiders, named as Defendants herein, have sold approximately over *$534 million* in stock since 1998.

10.     AMCC has effectively ***admitted*** that its officers and directors committed the egregious misconduct denounced by government officials. Specifically, on May 31, 2006, the Company announced that the Audit Committee of AMCC's Board would be reviewing the Company's historical stock options grant practices and related accounting.

11.     Furthermore, the Company's internal investigation itself is conflicted. As noted in

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

a July 26, 2006 *New York Times* article titled "Turning Back the Clock on Backdating," – "Amazingly, the company has appointed one of the men who sat on the compensation committee from 1999 to 2004 – Harvey P. White, a Qualcomm founder – to lead the company's internal investigation into backdating."

12.     On June 12, 2006, the Company announced that it had received an informal inquiry from the SEC requesting documents related to AMCC's stock option grants and practices.  On June 27, 2006, AMCC announced that it received a subpoena from the U.S. Attorney for the Northern District of California requesting documents relating to the Company's historical stock option practices. The Company also announced that it was contacted by the Office of the U.S. Attorney for the Southern District of California, which has opened its own investigation into the Company's historical stock option practices.

13.     On June 30, 2006, the Company announced that due to the delay in the filing of its Annual Report on SEC Form 10-K for the year ended March 31, 2006, AMCC received a letter from The Nasdaq Stock Market indicating that the Company's common stock is subject to delisting pursuant to Nasdaq Marketplace Rule 4310(c)(14).  This Rule requires the Company to make all filings with the SEC on a timely basis, as required by the Securities and Exchange Act of 1934 (the "Exchange Act").  On August 15, 2006, AMCC announced that it has received an additional Nasdaq delisting warning.

14.     As a result of this admitted misconduct, AMCC has suffered substantial harm.  Just recently, the Audit Committee of the AMCC's Board determined, with the concurrence of their outside auditors, Ernst & Young LLP, that all earnings press releases and similar communications issued by the Company, relating to fiscal years 1998 through 2005, as well as for the first quarter of 2006, should *not* be relied upon pending completion of the restatements.  AMCC will restate its historical financial results going back eight fiscal years – to its Initial Public Offering in November 1997 – and will continue to delay (as the Company did for the first quarter of fiscal year 2007) filing all quarterly and annual reports going forward.  The Audit Committee has preliminarily concluded that, pursuant to the requirements of Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees (the "APB 25"), different accounting

measurement dates for the purpose of computing compensation costs for certain stock options grants awarded during the years 1998 through 2006 should have been used.

15.     AMCC has admitted that the estimated $200 million in additional non-cash stock-based compensation expense beginning in fiscal year 1998 to date will have the effect of decreasing reported net income or increasing reported net loss, and increasing the reported accumulated deficit and additional paid-in capital figures contained in the Company's historical financial statements for the Relevant Period.

16.     In addition to the serious and adverse tax consequences, which resulted from the Company's failure to record $200 million additional non-cash stock-based compensation, AMCC faces millions in costs associated with the Audit Committee's review and the related restatements. AMCC will also likely admit to material weakness in its financial controls resulting in a qualified opinion from its outside auditor. AMCC's executives, including Defendants Rickey, Holliday, Tullie, Bedi, Gal, Bendush, Clark, Little, Winner, Sudireddy, Smith, Spreng, Lau, Pairman, Wilkie, Gargus, and Murphy, were also overpaid improper cash bonuses based on inflated earnings which created an inflated market capitalization for AMCC common stock.  The AMCC Board also continued to inflate or maintain the share price of AMCC common stock to preserve the value of misdated options given to its officers and directors through a share repurchase program adopted in August 2004.

17.     This action seeks redress for Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, candor, due care, and their knowing, reckless and/or gross negligence in, *inter alia*:

    a.    improperly backdating hundreds of grants of AMCC stock options to AMCC insiders, in violation of the Company's shareholder-approved stock option plans;

    b.    improperly recording and accounting the measurement date for the backdated stock options and its effect on stock option expenses and tax liabilities, in violation of Generally Accepted Accounting Principles ("GAAP");

    c.    improperly taking tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code ("IRC");

     d.       producing and disseminating to AMCC shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options;

     e.       failing to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of the Company's stock-based compensation plans; and

     f.       failing to ensure that AMCC operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information.

18.     This action states derivative claims for the Defendants' violation of Sections 14(a) of the Exchange Act. This action also seeks disgorgement of bonuses or other incentive-based or equity-based compensation received by the Option Defendants, and for any profits realized from their sale of AMCC securities, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX").

19.     Defendants' malfeasance has caused, and will continue to cause AMCC great harm, by (i) indelibly damaging its reputation and loss of goodwill in general; (ii) exposing the Company to an adverse opinion by its outside auditors and considerable financial cost in having to review and restate previously issued financial statements; (iii) creating potential difficulties for the Company in going to the capital and equity markets for financing; (iv) exposing the Company to civil liability; (v) denying the Company payment for common stock to which it was entitled; and (vi) exposing the Company to potential regulatory fines by the SEC and the Internal Revenue Service for failure to pay or withhold taxes as a consequence of the backdating of options provided to AMCC employees, including executive officers and directors.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(a)(1) because one or more of the Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## PARTIES

### The Plaintiffs

22.     Plaintiffs Berliner and Ciabatti are, and were at relevant times, shareholders of Nominal Defendant AMCC.

23.     As current holders of AMCC common stock and holders during the period of the wrongs alleged herein, and pursuant to Rule 23.1 of the Federal Rules of  Civil Procedure, Plaintiffs have standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

24.     Plaintiffs Berliner and Ciabatti filed verifications with their original verified complaints, filed July 11, 2006 and August 15, 2006, respectively.

### The Nominal Defendant

25.     Nominal Defendant AMCC is a Delaware corporation with its executive offices and principal place of business at 215 Moffett Park Drive, Sunnyvale, California 94089.

26.     AMCC was founded in 1979, and has been publicly traded since November 25, 1997.  According to the Company's website, AMCC provides the essential building blocks for the processing, moving and storing of information worldwide.  AMCC is a global leader in network and embedded PowerPC processing, optical transport and storage solutions. The Company's products enable the development of converged IP-based networks offering high-speed secure data, high-definition video and high-quality voice for carrier, metropolitan, access and enterprise applications.  AMCC provides networking equipment vendors with industry-leading network and communications processing, Ethernet, SONET and switch fabric solutions.  AMCC is also the

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

leading vendor of high-port count SATA RAID controllers enabling low-cost, high-performance, high-capacity storage. The Company markets and sells its products in the United States through a direct sales force, distributors, and manufacturers' representatives, as well as through regional offices internationally. The Company's common stock trades on NASDAQ under the symbol "AMCC."

**The Director Defendants**

27. The following Director Defendants served as members of the Board during the Relevant Period as follows:

**Cesaratto**

28. Defendant Cesaratto is currently the Chairman of the Board and has been a director since April 2002. He has been a member of the Compensation Committee since May of 2003. Cesaratto has also been a member of the Governance and Nominating Committee since 2003, and is currently the Chair. He served in numerous positions at Nortel Networks ("Nortel") from 1970 until May 2001, and retired from Nortel as President of Wireless Systems, EMEA. Cesaretto has been a member of the Board of Directors of Gennum Corporation ("Gennum") and its Compensation Committee since April 2002, and has also served as a director for SiGEM, Inc. since July 2001. He is also currently a member of the Board of Directors of Mediatrix Telecom, Inc., and a member of the Purple Angel investment group.

**Hooshmand**

29. Defendant Hooshmand is currently the Chief Executive Officer ("CEO"), President and a director of the Company. Hooshmand joined the Company in March 2005 after having served in different roles at Cisco Systems, Inc. ("Cisco") from 1996 until leaving in 2005 as Vice President and General Manager of the Optical and Broadband Transport Technology Group. Prior to that he was one of the early leaders that developed the Frame Relay market into a multi-billion dollar worldwide services market at StrataCom, which Cisco acquired in 1996. Hooshmand also serves as a board member on the Network Systems Development Conference ("Network Systems").

30. Upon information and belief, Hooshmand received approximately the following as

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2006 | 800,835 (including a $300,00 bonus for FY 2006 ) |
| 2005 | 13,849 (reflects a March 2005 start date) |

31.     Upon information and belief, Hooshmand received the following backdated options: (i) option grants dated March 21, 2005, to purchase 2,200,000 shares at the exercise price of $3.21 and 550,000 shares at the exercise price of $3.53; and (ii) an option grant dated June 2, 2005 to purchase 250,000 shares at the exercise price of $2.98.[1]

**Goldman**

32.     Defendant Goldman is currently a member of the Board of AMCC.  He has been a member of the Compensation Committee since June 2005.  Goldman worked at Motorola, Inc. ("Motorola") from July 1969 until January 1997, most recently serving as an Executive Vice President of Semiconductor Products.  After leaving Motorola, Goldman served at Transmeta Corporation as a business advisor from March 1997 through November 1998, CEO from October 2001 through April 2002, and has been Chairman since November 1998.  In addition, Goldman has served on the board of ZiLog, Inc., Wafer Scale Integration, Inc., Interactive Silicon, Inc. and Network Systems.  Goldman currently serves on the boards of Three-Five Systems, Inc. and Pericom Semiconductor Corporation.

**Shlapak**

33.     Defendant Shlapak is currently a member of the Board of the Company.  From 1970 through February 2004, Shlapak worked at Motorola, most recently as President and CEO of Semiconductor Products Sector.  He has served on the board of the Semiconductor Industry Association and Network Systems.  He has been a member of the boards of Gennum and Tundra Semiconductor Corporation since April 2004.

**Stabenow**

34.     Defendant Stabenow has served as a director of the Company since July 1988, and has been a member of the Compensation Committee since 1998.  Stabenow served as Chairman,

---

[1]     All stock option grants and stock prices herein are adjusted for stock splits.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

President and CEO of Micro Linear Corporation from April 1986 through January 1999. Prior to that, he was Vice President and General Manager at National Semiconductor Corporation ("National Semiconductor") beginning in 1979. Stabenow currently serves as a director at Zoran, Inc. ("Zoran"), is a member of its Audit, Compensation and Nominating Committees, and is designated by Zoran as a financial expert.

35.     Since January 21, 1999, Stabenow sold a total of 65,000 shares of AMCC common stock for a total of over *$6.8 million*.

**Sullivan**

36.     Defendant Sullivan became a director of the Company in February 2005, and is a member of the Compensation Committee. Sullivan has been the Vice President and Provost of the University of San Diego since July 2005. Prior to that she was a professor of accounting at the Rady School of Management at the University of California, San Diego ("UCSD"). Sullivan is a member of the board of Network Systems Design, and has done consultant work for companies such as Ernst & Young, General Electric and GlaxoSmithKline.

**White**

37.     Defendant White has served as a director of AMCC since April 1999, and was a member of the Compensation Committee from 2000-2003. White has held numerous positions at different technology companies, including TRW, Whittaker, and Ratheyon, and was one of the co-founders of Qualcomm. White served as director, Executive Vice President, Chief Operating Officer ("COO") and President in his time at Qualcomm from July 1985 to August 1998. He served as Chairman and CEO of the Cricket Communications subsidiary of Leap Wireless International, Inc. from August 1998 until April 2003. In June 2004 White founded (SHW)2 and currently serves as its Chairman.

**Wright**

38.     Defendant Wright has been a member of the Board since November 2004. He has also been a member of the Compensation Committee since November 2004. Wright is currently CEO and a director of Verari Systems ("Verari"). Prior to starting at Verari, Wright was an Executive Vice President at EMC2 Corporation from October 2003 through June 2006 after it

acquired Legato Systems, Inc., of which he was President and CEO from October 2000 to October 2003. From 1987 to October 2000, Wright served as President and CEO of Amdahl Corporation ("Amdahl"). From 1976 through 1987, he held various staff and management positions at IBM. Wright currently serves as a director at Insurance Services Office, Inc., Aspect Communications Corporation, and the Silicon Valley Marketing Group. He has been a member of the board of Metatomix, Inc. and Inrange Technologies Corporation.

**Rickey**

39. Defendant Rickey served as President and CEO of the Company from February 1996 through August 2005, in addition to his role as a member of the Board from February 1996 until August 2000, and as Chairman of the Board from August 2000 until 2005. Rickey served on the Stock Option Committee in 2000 and 2001. Rickey originally served as Vice President of Operations for AMCC from August 1993 through May 1995. In the interim, Rickey served as Vice President of Operations at NexGen from May 1995 to February 1996. Prior to 1993, Rickey held multiple engineering positions at IBM, Nortel Networks, and Cisco. Rickey has been a director on the boards of Cytori Therapeutics, Inc. since November 1999 and NetList, Inc. since February 2005. Rickey also served on the boards of Magis Networks, Inc., Silicon Wave, and Agility Communications during the Relevant Period. Rickey is also a board member of the San Diego Economic Development Corporation, the Foundation for Improvement of Math and Science Education, and the Executive Advisory Board for ASIM Center.

40. Upon information and belief, Rickey received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2005 | 425,063 (including transportation costs of $54,128) |
| 2004 | 408,979 |
| 2003 | 396,505 |
| 2002 | 485,417 |
| 2001 | 920,120 (including a $500,000 bonus for FY 2001) |
| 2000 | 698,550 (including a $350,000 bonus for FY 2000) |
| 1999 | 428,573 (including a $110,000 bonus for FY 1999) |
| 1998 | 516,034 (including a $212,900 bonus for FY1998) |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

41.     Upon information and belief, Rickey received the following backdated options: (i) an option grant dated March 27, 1998, to purchase 32,000 shares at the exercise price of $5.91 (the stock rose 5.75% within 20 trading days to $6.25 per share); (ii) an option grant dated April 23, 1999, to purchase 640,000 shares at the exercise price of $12.97 (the stock rose 63.38% within 60 trading days to $21.19 per share); (iii) an option grant dated January 19, 2000, to purchase 2,000,000 shares at the exercise price of $71.97 (the stock rose 64.08% within 40 trading days to $118.09 per share); (iv) an option grant dated December 21, 2000, to purchase 800,000 shares at the exercise price of $53.88 (the stock rose 39.30% within five trading days to $75.05 per share); (v) an option grant dated July 11, 2001, to purchase 400,000 shares at the exercise price of $14.62 (the stock rose 16.28% within five trading days to $17.00 per share); (vi) an option grant dated May 28, 2002, to purchase 5,200,000 shares at the exercise price of $6.54; (vii) an option grant dated July 1, 2002, to purchase 360,000 shares at the exercise price of $4.27 (the stock rose 14.75% within ten trading days to $4.90 per share); (viii); an option grant dated November 30, 2002, to purchase 2,440,000 shares at the exercise price of $4.08; and (ix) an option grant dated March 31, 2003, to purchase 560,000 shares at the exercise price of $3.32 (the stock rose 69.58% within 60 trading days to $5.63 per share).

42.     Upon information and belief, since May 7, 1998, Rickey sold approximately 2,225,269 shares of AMCC stock for proceeds of over approximately **_$193 million_**.

**Spreng**

43.     Defendant Spreng served as the Company's President and Chief Technical Officer ("CTO") from July 2001 through September 2002, and as a Senior Vice President from October 2000 through June 2001. Spreng was also a director at AMCC from 2001 through 2003. Spreng joined AMCC upon its acquisition of MMC Networks, of which he was President and CEO from April 1999 through October 2000. Prior to that, Spreng was an executive Vice President at 3Com Corporation from March 1992 until April 1999. Prior to that, Spreng served as President and COO at CellNet Data Systems, held numerous executive positions over 23 years at Hewlett-Packard Company, and was a Senior Vice President at Network Processing Group. Spreng has also served as a director of Silicon Image, Inc. ("Silicon Image") and Mellanox Technologies. He

1 currently serves as Chairman of Ubicom, where he served as CEO in 2003.

2     44.     Upon information and belief, Spreng received an option grant backdated to July 11,

3 2001, to purchase 4000,000 shares at the exercise price of $14.62 (the stock rose 16.28% within

4 five trading days to $17.00 per share).

5     45.     Upon information and belief, Spreng received the following as compensation, not

6 including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2002 | 347,805 |
| 2001 | 195,292 (including a $25,000 bonus for FY 2001) |

10     46.     Upon information and belief, on October 31, 2002, Spreng sold approximately

11 10,000 shares of AMCC common stock for proceeds of nearly $50,000.

12 **Raza**

13     47.     Defendant Raza served as a director on the Board of AMCC from 1999 through

14 2003, and was a member of the Compensation Committee from 2001 until 2003. Raza is currently

15 the CEO and Chairman of Raza Microelectronics, Inc., which he founded in July 2006. He served

16 as President, COO and director of Advanced Micro Devices ("AMD") from 1996 through 2006,

17 and was the founder, CEO and Chairman of NexGen from 1988 through 1996. Raza has held

18 numerous director positions, including at: Foundries Holding, Validity Sensors, Inc., Mellanox,

19 Matrix Semiconductors, AMI Semiconductor, eASIC, and TRG.

20     48.     Upon information and belief, since November 15, 1999, Raza sold approximately

21 45,666 shares of AMCC common stock for proceeds of over *$8 million*.

22 **Smullen**

23     49.     Defendant Smullen served at AMCC as Vice Chairman from August 2000 through

24 2005, Chairman from October 1982 until August 2000, Acting Vice President, Operations from

25 August 1997 until October 1997, and CEO from April 1983 until April 1987. Prior to his work at

26 AMCC, Smullen served as Senior Vice President, Operations at Intersil, Inc., founded National

27 Semiconductor in 1967, and worked as Director of Integrated Circuits at Fairchild Semiconductor.

28 Smullen also served as a director at Micro Linear Corporation in 1998.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

50.     Upon information and belief, since August 27, 1998, Smullen sold approximately 771,336 shares of AMCC common stock for proceeds of over *$83.5 million*.

**Bowes**

51.     Defendant Bowes served as a director on the Board of the Company from 1980 through 2002, and was also a member of the Audit Committee from 1998 through 2002.

52.     Upon information and belief, since March 11, 1998, Bowes sold approximately 184,520 shares of AMCC common stock, for proceeds of over *$10.3 million*.

**Ghest**

53.     Defendant Ghest was a director of the Company from 1997 through 2000, and served on the Compensation Committee during 1998 through 2000.

54.     Upon information and belief, since April 27, 1999, Ghest sold approximately 70,000 shares of AMCC common stock, for proceeds of over *$6 million.*

**The Option Defendants**

55.     The following Option Defendants, and Director Defendants Rickey, Spreng, and Hooshmand, are current or former officers or directors of AMCC whose stock option grants have been implicated in the backdating investigation:

**Gargus**

56.     Defendant Gargus is currently Senior Vice President and Chief Financial Officer ("CFO") of the Company.  Gargus joined AMCC in October 2005 from Open-Silicon, Inc., where he had served as CFO.  Prior to that, he served as CFO at Silicon Image, and before that, as President and CEO of Telecom Semiconductor.  Gargus also served as Controller, President and General Manager of Tandem Computers, a subsidiary of Atalla Corporation, for 10 years.

57.     Upon information and belief, Gargus received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | 110,577 |

58.     Upon information and belief, Gargus received an option grant backdated to October 10, 2005, to purchase 234,500 shares at the exercise price of $2.82 and 115,500 shares at the exercise price of $3.10.

**Holliday**

59.     Defendant Holliday served as Vice President, Finance, CFO, and Secretary of the Company from November 1981 through January 1999.

60.     Upon information and belief, Holliday received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 1999 | 219,276 (including a $40,000 bonus for FY 1999) |
| 1998 | 247,204 (including a $77,000 bonus for FY 1998) |

61.     Upon information and belief, Holliday received a backdated option grant dated March 27, 1998 to purchase 120,000 shares at the exercise price of $5.91 (the stock rose 5.75% within 20 trading days to $6.25 per share).

62.     Since May 7, 1998, Holliday sold a total of 427,666 shares of AMCC common stock for over *$16 million*.

**Tullie**

63.     Defendant Tullie joined AMCC in 1996 and served as the Company's COO until June 2005.  Tullie is currently a director, President and CEO of Path 1 Network Technologies, which he joined in November 2005.  At AMCC, Tullie served as Vice President, Sales from August 1996 to January 2001, Senior Vice President of Sales and Operations from January 2001 through October 2003, General Manager, Communications and Senior Vice President Sales from October 2003 through June 2005, and served as COO from 2004 through his departure in June 2005.  From 1989 to 1996 he served in various sales positions at S-MOS Systems.

64.     Upon information and belief, Tullie received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2005 | 392,321 |
| 2004 | 301,536 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

| 2003 | 267,926 |
| 2002 | 251,777 |
| 2001 | 553,077 (including a $25,000 bonus for FY 2001) |
| 2000 | 305,473 (including a $35,000 bonus for FY 2000) |
| 1999 | 274,199 (including a $25,000 bonus for FY 1999) |
| 1998 | 271,556 (including a $52,000 bonus for FY 1998) |

65.     Upon information and belief, Tullie received the following backdated options:  (i) an option grant dated March 27, 1998 to purchase 160,000 shares at the exercise price of $5.91 (the stock rose 5.75% within 20 trading days to $6.25 per share); (ii) an option grant dated April 23, 1999, to purchase 120,000 shares at the exercise price of $12.97 (the stock rose 63.38% within 60 trading days to $21.19 per share); (iii) an option grant dated March 8, 2000, to purchase 150,000 shares at the exercise price of $140.87; (iv) an option grant dated October 30, 2000, to purchase 100,000 shares at the exercise price of $64.06 (the stock rose 19.23% within five trading days to $76.38 per share); (v) an option grant dated December 21, 2000, to purchase 125,000 shares at the exercise price of $53.88 (the stock rose 39.30% within five trading days to $75.05 per share); (vi) an option grant dated July 11, 2001, to purchase 125,000 shares at the exercise price of $14.62 (the stock rose 16.28% within five trading days to $17.00 per share); (vii) an option grant dated May 28, 2002 to purchase 650,000 shares at the exercise price of $6.54; (viii) an option grant dated July 1, 2002, to purchase 50,000 shares at the exercise price of $4.27 (the stock rose 14.75% within ten trading days to $4.90 per share); (ix) an option grant dated January 27, 2003 to purchase 50,000 shares at the exercise price of $3.63 (the stock rose 11.85% within 60 trading days to $4.06 per share); (x) an option grant dated September 2, 2003, to purchase 65,000 shares at the exercise price of $5.89 (the stock rose 7.30% within 60 trading days to $6.32 per share); (xi) an option grant dated December 22, 2003 to purchase 65,000 shares at the exercise price of $5.65 (the stock rose 37.17% within 20 trading days to $7.75 per share); (xii) option grants dated June 3, 2004 to purchase 200,000 shares at the exercise price of $5.04 and 50,000 shares at an exercise price of $5.54 (the stock rose 4.76% within five trading days to $5.28 per share); (xiii) option grants dated September 2, 2004, to purchase 39,000 shares at the exercise price of $3.29 and 26,000 shares at an exercise price of $3.62 (the stock rose 13.37% within 60 trading days to $3.37

per share); and (ix) an option grant dated February 24, 2005, to purchase 100,000 shares at the exercise price of $3.60.

66.     Since May 7, 1998, Tullie sold a total of 633,568 shares of AMCC common stock for over *$54.5 million*.

**Bedi**

67.     Defendant Bedi served as AMCC's Vice President of Marketing from 1996 through 1999. Following that, Bedi served as President and CEO of NewPort Communications, Inc. Prior to working at AMCC, Bedi was the marketing director and general manager of storage at Philips Semiconductor from October 1993 through July 1996.

68.     Upon information and belief, Bedi received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 1998 | 230,644 |

69.     Upon information and belief, Bedi received an option grant backdated to March 27, 1998, to purchase 140,000 shares at the exercise price of $5.91 (the stock rose 5.75% within 20 trading days to $6.25 per share).

70.     Since May 7, 1998, Bedi sold a total of 111,065 shares of AMCC common stock for over *$3 million*.

**Gal**

71.     Defendant Gal joined the Company in January of 1997 and served as Vice President of Engineering until April 1999. Gal currently serves as Senior Vice President of Product Development and Engineering at Luxtera. Prior to joining Luxtera (and after leaving AMCC in April 1999), he served as Vice President at Maxim Integrated Products, Inc. Before working at AMCC, Gal served as a Director of Product Development at Motorola, a design manager at Burroughs/Unisys, and a staff scientist at IBM.

72.     Upon information and belief, Gal received the following as, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | 200,361 |
| 1998 | 271,556 (including a $52,000 bonus for FY 1998) |

73.     Upon information and belief, Gal received an option grant backdated to March 27, 1998, to purchase 140,000 shares at the exercise price of $5.91 (the stock rose 5.75% within 20 trading days to $6.25 per share)

74.     Since May 7, 1998, Gal sold a total of 159,100 shares of AMCC common stock for *nearly $5 million.*

**Bendush**

75.     Defendant Bendush was a Senior Vice President and CFO from 1999 through 2003.

76.     Upon information and belief, Bendush received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2003 | 237,000 |
| 2002 | 237,000 |
| 2001 | 402,275 (including a $175,000 bonus for FY 2001) |
| 2000 | 300,652 (including a $100,000 bonus for FY 2000) |

77.     Upon information and belief, Bendush received the following backdated options: (i) an option grant dated April 20, 1999, to purchase 500,000 shares at the exercise price of $12.06 (the stock rose 73.38% within 60 trading days to $20.91 per share); (ii) an option grant dated March 8, 2000, to purchase 150,000 shares at the exercise price of $140.87; (iii) an option grant dated December 21, 2000, to purchase 125,000 shares at the exercise price of $53.88 (the stock rose 39.30% within five trading days to $75.05 per share); (iv) an option grant dated July 11, 2001, to purchase 85,000 shares at the exercise price of $14.62 (the stock rose 16.28% within five trading days to $17.00 per share); (v) an option grant dated May 28, 2002, to purchase 685,000 shares at the exercise price of $6.54; and (vi) an option grant dated July 1, 2002, to purchase 75,000 shares at the exercise price of $4.27 (the stock rose 14.75% within ten trading days to $4.90 per share).

78.     Since April 25, 2000, Bendush sold a total of 240,000 shares of AMCC common

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

stock for over *$30 million*.

**Clark**

79.     Defendant Clark served as the Vice President, Operations of AMCC from November 1997 through December 2000.  Prior to that, Clark was the Director of Fabrication Operations at Integrated Device Technology ("IDT") from February 1995 through October 1997, the Director of Technology at Silicon Systems, Inc. ("Silicon Systems") from 1990 through 1995, and worked at National Semiconductor Corporation from 1987 through 1990.

80.     Upon information and belief, Clark received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2000 | 288,070 (including a $100,000 bonus for FY 2000) |
| 1999 | 248,155 (including a $35,000 bonus for FY 1999) |
| 1998 | 90,211 (including a $26,000 bonus for FY 1998) |

81.     Upon information and belief, Clark received the following backdated options:  (i) an option grant dated April 23, 1999, to purchase 120,000 shares at the exercise price of $12.97 (the stock rose 63.38% within 60 trading days to $21.19 per share); and (ii) an option grant dated March 8, 2000, to purchase 150,000 shares at the exercise price of $140.87.

82.     Since October 19, 1998, Clark sold a total of 243,333 shares of AMCC common stock for over *$21.5 million*.

**Little**

83.     Defendant Little joined the Company in 1991 and most recently served as Senior Vice President/General Manager of Storage before leaving in 2005.  From 1991 to January 2001, Little served as Vice President of Marketing, and was promoted to Senior Vice President and General Manager of Storage in January 2001.  Little is a former Project Engineer for the U.S. Navy, and has served as a director on Entridia Corporation.

84.     Upon information and belief, Little received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2004 | 242,000 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

- 19 -

| 2003 | 242,000 |
| 2002 | 231,615 |
| 2001 | 365,942 (including a $175,000 bonus for FY 2001) |
| 2000 | 265,338 (including a $100,000 bonus for FY 2000) |
| 1999 | 156,933 (including a $30,000 bonus for FY 1999) |
| 1998 | 162,465 (including a $37,000 bonus for FY 1998) |

85.     Upon information and belief, Little received the following backdated options: (i) an option grant dated April 23, 1999, to purchase 40,000 shares at the exercise price of $12.97 (the stock rose 63.38% within 60 trading days to $21.19 per share); (ii) an option grant dated August 3, 1999, to purchase 160,000 shares at the exercise price of $20.37 (the stock rose 64.31% within 60 trading days to $33.47 per share); (iii) an option grant dated March 8, 2000, to purchase 200,000 shares at the exercise price of $140.87; (iv) an option grant dated December 21, 2000, to purchase 150,000 shares at the exercise price of $53.88 (the stock rose 39.30% within five trading days to $75.05 per share); (v) an option grant dated July 11, 2001, to purchase 100,000 shares at the exercise price of $14.62 (the stock rose 16.28% within five trading days to $17.00 per share); (iv) an option grant dated May 28, 2002, to purchase 700,000 shares at the exercise price of $6.54; (v) an option grant dated July 1, 2002, to purchase 60,000 shares at the exercise price of $4.27 (the stock rose 14.75% within ten trading days to $4.90 per share); (vi) an option grant dated January 27, 2003, to purchase 70,000 shares at the exercise price of $3.63 (the stock rose 11.85% within 60 trading days to $4.06 per share); (vii) an option grant dated September 2, 2003, to purchase 65,000 shares at the exercise price of $5.89 (the stock rose 7.30% within 60 trading days to $6.32 per share); and (viii) an option grant dated December 22, 2003, to purchase 65,000 shares at the exercise price of $5.65 (the stock rose 37.17% within 20 trading days to $7.75 per share).

86.     Since April 27, 1999, Little sold a total of 106,630 shares of AMCC common stock for over *$7 million*.

**Winner**

87.     Defendant Winner is the former Senior Vice President of Engineering of the Company.  He worked at AMCC from 1999 to 2003, and is currently CEO of u-Nav Microelectronics.  Winner served as Vice President, product development at Silicon Systems from 1982 to 1999, and worked in various positions at Memorex, IBM, and General Dynamics.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

88.     Upon information and belief, Winner received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2001 | 408,837 (including a $175,000 bonus for FY 2001) |
| 2000 | 97,547 (including a $15,000 bonus for FY 2000) |

89.     Upon information and belief, Winner received an option grant backdated to December 21, 2000, to purchase 150,000 shares at the exercise price of $53.88 (the stock rose 39.30% within five trading days to $75.05 per share).

90.     Since January 18, 2001, Winner sold a total of 125,000 shares of AMCC common stock for over **$10.4 million**.

**Sudireddy**

91.     Defendant Sudireddy joined AMCC in March 1999 upon the acquisition of Cimaron Communications ("Cimaron"), and was promoted to Senior Vice President in January 2001. Sudireddy was co-founder, President and CEO of Cimaron from January 1998 to March of 1999. Sudireddy also founded Siltek Corporation and served as its Vice President of Research and Development from February 1996 to December 1997. From May 1991 to January 1996, Sudireddy was a member of the Technical Staff at AT&T Bell Laboratories. He is also a limited partner in a number of venture funds, and currently serves on the Board of Directors of Sanovi Corporation.

92.     Upon information and belief, Sudireddy received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2005 | 273,339 |
| 2004 | 235,730 |
| 2003 | 236,000 |
| 2002 | 210,462 |
| 2001 | 258,846 (including a $75,000 bonus for FY 2001) |

93.     Upon information and belief, Sudireddy received the following backdated options: (i) an option grant dated May 28, 2002 to purchase 625,000 shares at the exercise price of $6.54;

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

(ii) an option grant dated July 1, 2002 to purchase 60,000 shares at the exercise price of $4.27 (the stock rose 14.75% within ten trading days to $4.90 per share); (iii) an option grant dated September 11, 2002, to purchase 65,000 shares at the exercise price of $3.96 (the stock rose 26.77% within 40 trading days to $5.02 per share); (iv) an option grant dated January 27, 2003 to purchase 75,000 shares at the exercise price of $3.63 (the stock rose 11.85% within 60 trading days to $4.06 per share); (v) an option grant dated September 2, 2003, to purchase 100,000 shares at the exercise price of $5.89 (the stock rose 7.30% within 60 trading days to $6.32 per share); (vi) an option grant dated December 22, 2003, to purchase 100,000 shares at the exercise price of $5.65 (the stock rose 37.17% within 20 trading days to $7.75 per share); and (vii) option grants dated September 2, 2004, to purchase 39,000 shares at the exercise price of $3.29 and 26,000 shares at the exercise price of $3.62 (the stock rose 13.37% within 60 trading days to $3.73 per share).

94.     Since April 27, 1999, Sudireddy sold a total of 674,795 shares of AMCC common stock for proceeds of over *$59.4 million*.

**Smith**

95.     Defendant Smith retired from AMCC as Senior Vice President and CFO June 2005. Smith joined AMCC in 1999 as Vice President, Business Development, and also held the position of Vice President, Controller before being promoted in April 2003 to Senior Vice President and CFO.   Prior to working at AMCC, Smith held positions at ST Microelectronics, Vixel Corporation, Nortel and Motorola.  Smith has also served on the board of Entridia Corporation.

96.     Upon information and belief, Smith received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2004 | 206,403 |
| 2003 | 182,979 |
| 2002 | 183,717 |

97.     Upon information and belief, Smith received the following backdated options:  (i) an option grant dated April 1, 2003 to purchase 75,000 shares at the exercise price of $3.32 (the stock rose 70.18% within 60 trading days to $5.65 per share); (ii) an option grant dated September

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

2, 2003, to purchase 50,000 shares at the exercise price of $5.89 (the stock rose 7.30% within 60 trading days to $6.32 per share); and (iii) an option grant dated December 22, 2003, to purchase 50,000 shares at the exercise price of $5.65 (the stock rose 37.17% within 20 trading days to $7.75 per share).

98.     Since October 16, 2000, Smith sold a total of 95,000 shares of AMCC common stock for over **$14.6 million**.

**Lau**

99.     Defendant Lau joined AMCC in April 2005 and currently is the Company's Senior Vice President and General Manager, Integrated Communications Products.  Lau came to AMCC from IDT, where he was Vice President and General Manager of the serial switching division from May 2004 to May 2005.  In October 1999, Lau co-founded ZettaCom, where he served as President and CEO until May 2004.  From 1992 to October 1999, he held various positions at Cisco, and prior to that, he worked at the ASIC development group N.E.T., and Amdahl Corporation ("Amdahl").

100.    Upon information and belief, Lau received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2006 | 314,000 (including a fixed $100,000 bonus per contract of employment) |

101.    Upon information and belief, Lau received the following backdated options:  (i) option grants dated May 31, 2005, to purchase 234,500 shares at the exercise price of $2.86 and 115,500 shares at the exercise price of $3.15; and (ii) option grants dated October 28, 2005 to purchase 99,000 shares at the exercise price of $2.64 and 201,000 shares at the exercise price of $2.40.

**Pairman**

102.    Defendant Pairman joined AMCC as a Senior Vice President and General Manager, Storage Business in 2004 when AMCC acquired 3ware, Inc. ("3ware") where she had served as President and CEO since August 2002.  Prior to that, Pairman served as CEO at Redline Networks from July 2001 to August 2002, and as Vice President and General Manager, Storage at

Adaptec, Inc. ("Adaptec") from 1993 to July 2001.   Before Adaptec, Pairman held various marketing management positions at SuperMac Technology and Eastman Kodak Company

103.   Upon information and belief, Pairman received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | 247,620 |
| 2005 | 244,604 |

104.   Upon information and belief, Pairman received the following backdated options: (i) option grants dated September 2, 2004, to purchase 10,000 shares at the exercise price of $3.29 and 15,000 shares at the exercise price of $3.62 (the stock rose 13.37% within 60 trading days to $3.73 per share); (ii) an option grant dated February 24, 2005 to purchase 50,000 shares at the exercise price of $3.60; and (iii) option grants dated October 28, 2005, to purchase 66,000 shares at the exercise price of $2.64 and 134,000 shares at the exercise price of $2.40.

105.   Since August 25, 2004, Pairman sold a total of 574,193 shares of AMCC common stock for over *$2 million*.

**Wilkie**

106.   Defendant Wilkie joined AMCC in May 2004 and currently serves as Vice President and General Manager, Embedded Products Group.   Prior to AMCC, Wilkie spent 25 years at Motorola.  He has also been a consultant to Chartered Semiconductor.

107.   Upon information and belief, Wilkie received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | 314,037 (including a fixed $121,500 bonus per contract of employment) |
| 2005 | 249,889 (including a fixed $90,000 bonus per contract of employment) |

108.   Upon information and belief, Wilkie received the following backdated options:  (i) an option grant dated May 24, 2004, to purchase 160,000 shares at the exercise price of $5.09 (the stock rose 8.45% within ten trading days to $5.52 per share); (ii) an option grant dated September 2, 2004, to purchase 10,000 shares at the exercise price of $3.29 and 15,000 shares at the exercise

price of $3.62 (the stock rose 13.37% within 60 trading days to $3.73 per share); (iii) an option grant dated February 24, 2005, to purchase 50,000 shares at the exercise price of $3.60; and (iv) an option grant dated September 29, 2005, to purchase 60,000 shares at the exercise price of $2.98.

**Murphy**

109.    Defendant Murphy joined AMCC in 2004 as Vice President and General Manager of Storage when the Company acquired 3ware, where she had been Vice President of Marketing. Prior to working at 3ware, Murphy was a marketing consultant for various technology companies, assisting in the development of business plans and go-to-market strategies.   She was also the Senior Director of Product Marketing at Roxio (an Adaptec spin-out).   Prior to Roxio, Murphy spent over five years at Adaptec, holding numerous marketing management positions. Before joining Adaptec, Murphy was a marketing manager for British Telecom, North America and earlier she held several engineering positions at GEC Plessey Telecommunications.

110.    Upon information and belief, Murphy received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2006 | 202,514 (including a $1200 bonus for FY 2006) |

111.    Upon information and belief, Murphy received an option grant backdated to September 29, 2005 to purchase 62,000 shares at the exercise price of $2.98.

**OBLIGATIONS AND DUTIES OF THE DEFENDANTS**

112.    By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of AMCC, each of the Defendants owed AMCC and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto.  Further, Defendants owed a duty to AMCC and its shareholders to ensure that the Company operated in compliance with all applicable federal and state laws, rules, and regulations, and that the Company did not engage in any unsafe, unsound, or illegal

business practices.  The conduct of Defendants complained of herein involves knowing violations of their duties as directors of the Company, and the absence of good faith on their part, which Defendants were aware or should have been aware, posed a risk of serious injury to the Company.

113.    To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of AMCC.  By virtue of this obligation of ordinary care and diligence, Defendants were required, among other things, to:

a.    manage, conduct, supervise, and direct the employees, businesses and affairs of AMCC in accordance with laws, rules and regulations, and the charter and by-laws of the Company;

b.    neither violate nor knowingly or recklessly permit any officer, director or employee of AMCC to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees;

c.    ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

d.    remain informed as to how AMCC was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

e.    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by AMCC, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of AMCC, and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

f.    preserve and enhance AMCC's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

114.    Defendants breached their duties of loyalty, full disclosure, due care and/or good faith by backdating options and/or allowing Defendants to cause, or themselves causing, the

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

Company to misrepresent its financial results, as detailed herein, and/or by failing to prevent Defendants from taking such illegal actions.

## THE AMCC BOARD

115.   Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to AMCC a duty to insure that the Company's financial reporting fairly presented, in all material aspects, the operations and financial condition of AMCC.  In order to adequately carry out these duties, it is necessary for Director Defendants to know and understand the material information to be disclosed in the Company's public statements.  This material information included the fact that AMCC's internal controls were woefully defective and that the Company's Board was improperly backdating stock options to benefit Company insiders.

## DUTIES AND RESPONSIBILITIES OF THE AUDIT, COMPENSATION, AND GOVERNANCE AND NOMINATING COMMITTEES

116.   The standing committees of the Board include: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Governance and Nominating Committee.

117.   These Committees set the policies (subject to review by the entire Board) which admittedly permitted the backdating of option grants to occur.

### *Audit Committee*

118.   The following Director Defendants served on the Audit Committee of the AMCC Board at certain times during the Relevant Period:

| Audit Committee | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** |
| Bowes | M | M | M | M | M | | | |
| Smullen | M | M | M | | | | | |
| Stabenow | | | | | | M | M | M |
| White | | | | | | | M (since 3/04) | C (as of annual meeting) |
| Sullivan | | | | | | | | M (since 2/05) |
| *Meetings per Year* | *1* | *4* | *5* | *6* | *5* | *7* | *9* | *13* |
| **M = Member  C = Chair** | | | | | | | | |

119. According to the AMCC Compensation Committee Charter:

The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Board of Directors (the "Board") of Applied Micro Circuits Corporation (the "Company") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal accounting and financial controls, and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing an audit report or performing other audit services (the "Auditors").

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication among the Committee, the Auditors and the Company's financial management.

120. According to the Audit Committee Charter, the responsibilities of the Committee are as follows:

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

\*       \*       \*

8.    To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission ("SEC") and to recommend whether or not such financial statements should be so included.

9.    To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

10.  To review with management and the Auditors the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States).

11.  To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

12.  To review with management and the Auditors, as appropriate, earnings press releases.

13.  To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management and any other significant reporting issues and judgments.

14.  To review with management (or without management present, as the Committee deems appropriate) and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and significant claims made on the Company's insurance policies, and the steps taken by management to monitor and control these exposures.

15.  To review significant actual and potential litigation claims with the Company's General Counsel, any other officer of the Company responsible for such claims, and/or outside counsel engaged by the Company to represent the Company with respect to such claims, and the steps taken to resolve such claims.

                    *       *       *

19.  To review with management and the Auditors (or any other registered public accounting firm) any conflicts or disagreements between management and the Auditors (or such firm) regarding financial reporting, accounting practices or policies and to resolve any such conflicts or disagreements regarding financial reporting.

20.  To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting, including any special audit steps taken in the event of material control deficiencies.

                    *       *       *

22.  To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

23.    To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

24.    To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

25.    To review with counsel, the Auditors and management, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements.

                    *        *        *

27.    To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and approval of related-party transactions as required by Nasdaq rules.

                    *        *        *

30.    To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the performance or independence of the Company's Auditors, or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

121.    Additionally, the Company's web site states that one of the responsibilities of the Audit Committee is:

At least annually, to obtain and review a report by the Auditors describing that firm's internal quality-control procedures, any material issues raised by the firm's most recent internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to one or more independent audits performed by the firm, as well as any steps taken to address the issues raised.

***Compensation Committee***

122.    The following Director Defendants served on the Compensation Committee of the AMCC Board at certain times during the Relevant Period:

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

- 30 -

| Compensation Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** |
| Stabenow | M | M | M | M | M | C | C | C |
| Ghest | M | M | M | | | | | |
| White | | | M | M | M | M | M (until 3/04) | |
| Raza | | | | M | M | M (until 4/03) | | |
| Cesaratto | | | | | | M (since 5/03) | M | M |
| Wright | | | | | | | | M (since 11/04) |
| Goldman | | | | | | | | M (since 6/05) |
| *Meetings per Year* | *3* | *3* | *4* | *4* | *4* | *4* | *7* | *13* |
| **M = Member  C = Chair** | | | | | | | | |

123.   According to the Company's Compensation Committee Charter:

The purpose of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Applied Micro Circuits Corporation (the "Company") shall be to act on behalf of the Board in fulfilling the Board's responsibilities to oversee the Company's compensation policies, plans and programs, and to review and determine the compensation to be paid to the Company's executive officers, as well as to prepare and review the Committee report included in the Company's annual proxy statement in accordance with applicable rules and regulations of the Securities and Exchange Commission (the "SEC") in effect from time to time.  The term "compensation" shall include salary, long-term incentives, bonuses, perquisites, equity incentives, severance arrangements, retirement benefits and other related benefits and benefit plans.

124.   According to the Company's Compensation Committee Charter, its responsibilities are as follows:

1.   *Overall Compensation Strategy.* The Committee shall review, modify (as needed) and approve the overall compensation strategy and policies for the Company, including:

• establishing annual and long-term individual and corporate performance goals and objectives for the Chief Executive Officer;

• reviewing individual and corporate performance goals and objectives relevant to the compensation of the Company's other executive officers;

• evaluating and recommending to the Board the compensation plans and programs advisable for the Company, as well as modification or termination of existing plans and programs;

- reviewing regional and industry-wide compensation practices and trends to assess the adequacy and competitiveness of the Company's executive compensation programs among comparable companies;

- establishing policies with respect to equity compensation arrangements, with the objective of appropriately balancing the perceived value of equity compensation and the dilutive costs of that compensation to the Company; and

- reviewing and approving the terms of any employment agreements, severance arrangements, change-of-control protections and any other compensatory arrangements for the Company's executive officers.

2. *Compensation of Chief Executive Officer.* The Committee shall determine and approve the compensation and other terms of employment of the Company's Chief Executive Officer and shall evaluate the Chief Executive Officer's performance in light of relevant individual and corporate performance goals and objectives, including the Chief Executive Officer's performance in:

- fostering a corporate culture that promotes the highest levels of integrity and the highest ethical standards;

- developing and executing the Company's long-term strategic plan and conducting the business of the Company in a manner appropriate to enhance long-term stockholder value;

- achieving any other corporate performance goals and objectives deemed relevant to the Chief Executive Officer as established by the Committee; and

- achieving the Chief Executive Officer's individual performance goals and objectives.

In determining the incentive components of the Chief Executive Officer's compensation, the Committee should consider the Company's performance and relative stockholder return, the potential benefits and costs to the Company of the award, the value of similar incentive awards given to chief executive officers of comparable companies, the awards given to the Chief Executive Officer in past years, and such other criteria as the Committee deems advisable. The Chief Executive Officer may not be present during the voting or deliberations regarding his or her compensation.

3. *Compensation of Other Executive Officers.* The Committee shall review the individual and corporate performance goals and objectives of the Company's other executive officers. The Committee shall determine and approve the compensation and other terms of employment of these executive officers, taking into consideration their success in achieving individual performance goals and objectives and the corporate performance goals and objectives deemed relevant as established by the Committee, as well as in fostering a corporate culture that promotes the highest levels of integrity and the highest ethical standards.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

4.    *Administration of Benefit Plans.* The Committee shall recommend to the Board the adoption, amendment and termination of the Company's stock option plans, stock appreciation rights plans, pension and profit sharing plans, incentive plans, stock bonus plans, stock purchase plans, bonus plans, deferred compensation plans and similar programs. The Committee shall have full power and authority to administer these plans, establish guidelines, interpret plan documents, select participants, approve grants and awards, and exercise such other power and authority as may be permitted or required under such plans.

### *Governance and Nominating Committee*

125.    The following Director Defendants served on the Governance and Nominating Committee of the AMCC Board at certain times during the Relevant Period:

| Governance and Nominating Committee | | | | | |
|---|---|---|---|---|---|
| **Defendant** | **2001** | **2002** | **2003** | **2004** | **2005** |
| Stabenow | M | M | M | M | M |
| Raza | M | M | | | |
| White | M | M | | | C (as of annual meeting) |
| Cesaratto | | | C | C | C |
| *Meetings per Year* | *0* | *0* | *3* | *6* | *7* |
| **M = Member   C = Chair** | | | | | |

126.    According to the Company's Governance and Nominating Committee Charter, its purpose is:

- to oversee all aspects of the Company's corporate governance functions on behalf of the Board and make recommendations to the Board regarding corporate governance issues;

- to identify, review and evaluate candidates to serve as directors of the Company and review and evaluate incumbent directors and select nominees for election as directors at the annual meeting of stockholders; and

- make other recommendations to the Board regarding affairs relating to the directors of the Company, including director compensation.

127.    According to its Charter, the responsibilities of the Governance and Nominating Committee are:

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

**Corporate Governance**

1.    To prepare, recommend and establish a process for monitoring compliance with a code of business conduct and ethics, including a conflict of interest policy, for adoption by the Board.

2.    To recommend guidelines and policies for corporate governance for adoption by the Board, including policies furthering open communications among directors, senior management and outside advisors and requiring regular meetings of the independent directors in executive session in compliance with the applicable rules of Nasdaq. …

3.    To periodically review and assess the code of business conduct and ethics and corporate governance guidelines and policies and their application and recommend any changes deemed appropriate to the Board for its consideration.

*     *     *

**Board and Committee Assessment**

10.    To review, discuss and assess periodically the performance and effectiveness of the Board. ...

**Board Policies and Planning**

11.    To evaluate no less often than annually and make a recommendation to the Board with respect to the compensation of the non-employee directors.

12.    To oversee the orientation of new directors upon election to the Board.

13.    To prepare and recommend guidelines regarding directors' service on additional boards of directors for adoption by the Board.

*     *     *

16.    To oversee and review the processes and procedures used by the Company to provide information to the Board and its committees after taking into consideration, among other factors, the reporting channels through which the Board and its committees receive information and the level of access to outside advisors where necessary or appropriate, as well as the procedures for providing accurate, relevant and appropriately detailed information to the Board and its committees on a timely basis.

**Failure of Board's Committees to Act**

128.    The Board should have been aware, as conceded in the Company's September 14, 2006 press release, that "the Company should have used different measurement dates for the purpose of computing compensation costs for certain stock option grants."  Under the charters and policies of each of the three Committees (Audit, Compensation, and Governance Nominating), the

1   Director Defendants had an obligation to investigate the difference in the measurement dates and

2   recorded dates of stock option grants.  However, they failed to do so until the financial press began

3   its own investigation.

4       129.    The Director Defendants had ample opportunity to discuss the material information

5   at issue with management and their fellow directors at any of the numerous Board and Committee

6   meetings that occurred during the Relevant Period and thereafter.

7       130.    During the Relevant Period, Director Defendants participated in, caused or allowed

8   the manipulation of stock option grant dates so as to illegally maximize stock profits for AMCC

9   insiders.  Specifically, stock option grant dates were backdated to take advantage of lower exercise

10  prices than the prices on the actual grant date.  The price of AMCC shares on the reported

11  option-grant date, therefore, was lower than the share price on the actual day options were issued –

12  thus, providing these AMCC insiders with more favorably priced options.

13      131.    Backdating these stock option grants brought an instant paper gain to these insiders

14  because the options were priced below the stock's fair market on the actual grant date.   Under

15  GAAP, this instant paper gain was equivalent to paying extra compensation and was thus a cost to

16  AMCC.   These costs were also not properly recorded, and in turn, AMCC's profits were

17  overstated during the Relevant Period.

18      132.    Furthermore, despite their duties, Director Defendants negligently, recklessly,

19  and/or intentionally caused or allowed, by their actions or inactions, improper statements to be

20  disseminated by AMCC to the investing public and the Company's shareholders during the

21  Relevant Period.

22      133.    Instead of properly disclosing these improper stock option backdating practices and

23  the corresponding understatement of compensation costs, Director Defendants participated in,

24  caused or allowed these practices to continue unabated throughout the Relevant Period.  As a

25  result, the press releases and SEC filings from the Relevant Period materially misstated AMCC's

26  earnings in violation of GAAP.

27      134.    Director Defendants misrepresented and actively concealed and caused the

28  Company to misrepresent and actively conceal in public SEC filings that the stock options were

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plans, referenced below in ¶140, were exhibits that were incorporated by reference each year in the Company's Annual Reports on SEC Form 10-K. Also, the Option Defendants' compensation, including their stock option grants, was disclosed in the Company's yearly proxy statements promulgated in connection with the Company's annual meetings. Director Defendants' misrepresentations about their stock option grant pricing practices were known to be false or were made in reckless disregard of their truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder.

135.    These misstatements, in turn, effected an artificial inflation of the Company's stock price, which certain Defendants utilized to sell approximately 6.8 million shares of AMCC stock totaling over *$534 million* of their personal holdings since 1998.

136.    Director Defendants' breaches of their fiduciary duties have exposed the Company to a number of harms including: the expense of the internal investigations, the expense of the SEC and U.S. Attorney investigations, the potential liability under tax laws and federal securities laws, the expense of having to restate financial results, and liability to stock purchasers.

**Director Compensation**

137.    Under the Company's 1997 Directors' Stock Option Plan ("1997 Plan"), according to the Company's June 15, 1998 Proxy Statement, each person who became a non-employee director of AMCC was granted a non-statutory stock option to purchase 12,500 shares of common stock on the date on which he or she became a non-employee director of the Company. Thereafter, on April 1 of each year (starting in 2000 for non-employee directors who were serving as of the date of the closing of the initial public offering, which was declared effective on November 24, 1997), each non-employee director was granted an option to purchase 12,500 shares of common stock if on such date, he or she had served on AMCC's Board for at least six months. Directors were also reimbursed by AMCC for customary and usual travel expenses incurred with attendance at meetings of the Company. According to the Proxy Statement dated July 10, 2000, automatic grants to new directors were increased to an option to purchase 50,000 shares, and each

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

incumbent non-employee director who continued to serve as a director after six months on the Board was offered an option to purchase an additional 50,000 shares on April 1 of each year. According to the July 12, 2001 Proxy Statement, automatic grants to new directors were increased to an option to purchase 100,000 shares. As of the July 11, 2005 Proxy Statement, this automatic grant was decreased to an option to purchase 75,000 shares, and the Chairman of the Board was granted an additional option to purchase 10,000 shares on April 1 of each year. Each grant under the 1997 Plan should have had an exercise price per share equal to the fair market value per share on the grant date.

138. In addition, as of the June 23, 1999 Proxy Statement, non-employee directors of AMCC received a $12,000 annual fee and fees of $500 per meeting attended. According to the July 10, 2002 Proxy Statement, effective April 1, 2002, each non-employee director was to receive a fee of $1,000 for each regular Board meeting attended and each special Board meeting or committee meeting attended in person and $500 for each special Board meeting or committee meeting attended by telephone. Compensation of non-employee directors who are committee members was increased according to the July 17, 2003 Proxy Statement such that the annual retainer for non-employee directors remained $12,000, with an additional $8,000 retainer for committee members. The meeting fees paid to non-employee directors were also set at: $2,000 per quarterly meeting attended, $500 per telephonic meeting, $1,000 per Committee meeting attended, and $500 per telephonic Committee meeting. Compensation of non-employee directors who are Chairmen of a Committee of the Board was also increased according to the July 16, 2004 Proxy Statement to $12,000. As of the July 11, 2005 and April 14, 2006 Proxy Statements, the retainer for the Chairman of the Board was set at $24,000.

139. As of July 11, 2006, the Company had authorized payment of a fee of $500 per meeting attended by members of the Enterprise Risk Management Committee who are non-employee directors and a fee of $1,000 per meeting by the Compensation Committee Chairman with AMCC's independent compensation consultant.

# BACKGROUND

## AMCC'S Stock Option Plans

140.    For the purposes of this complaint, during the Relevant Period the Company had the following stock option plans in place:

    a.    The 1992 Stock Option Plan (the "1992 Plan") provides for the grant of stock options to employees, directors and consultants.  Incentive stock options, however, under the 1992 Plan, may only be granted to AMCC employees, including officers who are employees.  The 1992 Plan provides that "the exercise price for an option cannot be less than 100% of the fair market value of the common stock subject to the option on the date of grant."

    b.    The 1997 Plan provides both automatic and non-discretionary grants to outside directors.  The 1997 Plan provides that "the exercise price per share shall be 100% of the fair market value per share on the date of grant of the first option."

    c.    The 2000 Equity Incentive Plan (the "2000 Plan") provides for the grant of non-statutory stock options, stock bonuses and rights to acquire restricted stock to employees, directors and consultants.  The Board, or a committee thereof, has the authority to administer the 2000 Plan.  The 2000 Plan provides that "the exercise price of each Nonstatutory Stock Option shall be not less than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted."

    d.    On August 12 2004, AMCC's Board authorized a program to repurchase shares of AMCC common stock having an aggregate value of up to $200 million ("2004 Share Repurchase Program"). Depending on market conditions and other factors, the 2004 Share Repurchase Program allows repurchases from time to time in the open market and in negotiated transactions, including block transactions or accelerated stock repurchase transactions, at times and prices considered appropriate by the Company. The program went into effect immediately on the date of approval, and the Board has the ability to discontinue it at any time.

141.    These plans cover options granted to employees, consultants and outside directors of the Company.  Under all three plans, the exercise price of options granted was to be not less than 100% of the fair market value on the day of the grant.

## Media Uproar Over Option Awards

142.    On May 19, 2006, *The Wall Street Journal* published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. Intensifies Stock-Options Probe: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

Scrutiny." The subject matter of this article, and several others in previous and subsequent days, was the illegal backdating of stock option grants to senior executives at the expense of public companies like AMCC.

143. In a June 10, 2006, *The Wall Street Journal* article titled, "Silicon Valley Firms Draw SEC Options Inquiries," the author also called the practice of backdating as "roughly akin to being allowed to bet on a horse race after it is over. …"

144. On September 6, 2006, in a *MarketWatch* article titled, "SEC Probing More Than 100 Firms on Options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "[c]orporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

## SUBSTANTIVE ALLEGATIONS

### AMCC's Admissions and the Internal Investigation

145. On May 31, 2006, AMCC announced that its Audit Committee, with outside legal counsel, would begin an internal probe, reviewing the Company's historical stock option grant practices and related accounting. In connection with this review, the Company delayed a special meeting of stockholders to approve a proposed option exchange and amendment and restatement of the Company's 1992 Stock Option Plan until June 30, 2006.

146. On June 12, 2006, the Company announced that it had received an informal inquiry from the SEC requesting documents related to AMCC's stock option grants and practices, and announced that it would be seeking an extension to file its annual report due to the SEC's investigation. AMCC's CEO Hooshmand also noted that the internal investigation would look back at least seven years.

147. On June 27, 2006, AMCC announced that it received a subpoena from the U.S. Attorney for the Northern District of California requesting documents relating to the Company's historical stock option practices. The Company also announced that it was contacted by the Office of the U.S. Attorney for the Southern District of California, which opened its own investigation into the Company's historical stock option practices, and that the special stockholders' meeting

1   would be adjourned until July 28, 2006.[2]

2   148.   On June 30, 2006, the Company announced that due to the delay in the filing of its

3   Annual Report on SEC Form 10-K for the year ended March 31, 2006, AMCC received a letter

4   from The Nasdaq Stock Market indicating that the Company's common stock is subject to

5   delisting pursuant to Nasdaq Marketplace Rule 4310(c)(14). This Rule requires the Company to

6   make all filings with the SEC on a timely basis, as required by the Exchange Act.

7   149.   On July 3, 2006, AMCC announced that it would not release its first quarter of

8   fiscal year 2007 earnings report until it finishes its annual report, which remains delayed pending

9   the internal investigation into its stock option grant procedures and related accounting.  On July

10  25, 2006, the special stockholders' meeting was again postponed to August 25, 2006 pending the

11  internal stock option grant review.

12  150.   On August 3, 2006, AMCC reported its revenue for the first quarter of fiscal year

13  2007, however was unable to finalize its financial results pending the internal investigation.

14  AMCC also announced that it had requested and was granted a hearing before the Nasdaq Listing

15  Qualification Panel.  At the hearing, scheduled for August 17, 2006, AMCC's management was to

16  present in person its plan to regain compliance with Nasdaq's filing requirement, although the

17  request for an extension also hinged on the Company filing its Annual Report on Form 10-K for

18  the year ended March 31, 2006.

19  151.   AMCC announced on August 4, 2006 that it had been subpoenaed by the U.S.

20  Attorney's Office of the Southern District of California for information about its stock option

21  grants.

22  152.   On August 9, 2006, AMCC cited its ongoing internal review of stock option

23  practices as the reason for its delay in filing its Quarterly Report on Form 10-Q for the quarter

24  ending June 30, 2006.

25  

26  [2]     Since the filing of Plaintiffs' original complaints, the investigation of AMCC by the U.S. Attorney
27  for the Northern District of California has been discontinued, however, the probe of AMCC by the U.S.
    Attorney for the Southern District of California remains in progress and it remains under investigation by
28  federal authorities.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

153.   On August 15, 2006, AMCC announced that due to the delay in the filing of its Quarterly Report on Form 10-Q for the quarter ending June 30, 2006, it had received an additional letter from The Nasdaq Stock Market indicating that the Company's common stock is subject to delisting pursuant to Nasdaq Marketplace Rule 4310(c)(14).

154.   AMCC again postponed the special meeting of stockholders from August 25, 2006 to September 22, 2006 pending the Audit Committee's review of the Company's stock option grant practices.

155.   On September 14, 2006, AMCC announced that the Company's Audit Committee had substantially completed its review of the Company's stock option grant practices and related accounting, and concluded that, pursuant to the requirements of APB 25, for the fiscal years 1998 through 2006, AMCC "should have used different measurement dates for the purpose of computing compensation costs for certain stock option grants."   As a result of applying new accounting measurement dates, the Company announced that it "expects to recognize up to $200 million in non-cash stock-based compensation expense beginning in fiscal year 1998."   The Company further admitted that pending final completion of the review by the Audit Committee and independent public accountants, AMCC's financial statements and all financial press releases and similar communications issued by AMCC from fiscal year 1998 on should not be relied upon.

156.   On September 20, 2006, AMCC announced that it had postponed its special shareholder meeting a fourth time to October 20, 2006 due to its pending review of the Company's stock option granting practices.

**Manipulation of Options**

157.   At all times relevant hereto the Compensation Committee approved grants under and supervised the administration of the Company's stock option plans.

158.   From fiscal years 1998 to 2005, the Compensation Committee granted the Option Defendants AMCC stock options as follows:

| Purported Date of Grant | Exercise Price[3] | Name | # of Options[4] | Stock Option Plan |
|---|---|---|---|---|
| 03/27/98 | $5.91 | Rickey | 32,000 | 1992 Plan |
| | | Holliday | 120,000 | 1992 Plan |
| | | Tullie | 160,000 | 1992 Plan |
| | | Bedi | 140,000 | 1992 Plan |
| | | Gal | 140,000 | 1992 Plan |
| 04/20/99 | $12.06 | Bendush | 500,000 | 1992 Plan |
| 04/23/99 | $12.97 | Rickey | 640,000 | 1992 Plan |
| | | Tullie | 120,000 | 1992 Plan |
| | | Clark | 120,000 | 1992 Plan |
| | | Little | 40,000 | 1992 Plan |
| 08/3/99 | $20.37 | Little | 160,000 | 1992 Plan |
| 01/19/00 | $71.97 | Rickey | 2,000,000 | 1992 Plan |
| 03/8/00 | $140.87 | Tullie | 150,000 | 1992 Plan |
| | | Bendush | 150,000 | 1992 Plan |
| | | Clark | 150,000 | 1992 Plan |
| | | Little | 200,000 | 1992 Plan |
| 10/30/00 | $64.06 | Tullie | 100,000 | 1992 Plan |
| 12/21/00 | $53.88 | Rickey | 800,000 | 1992 Plan |
| | | Tullie | 125,000 | 1992 Plan |
| | | Winner | 150,000 | 1992 Plan |
| | | Bendush | 125,000 | 1992 Plan |
| | | Little | 150,000 | 1992 Plan |
| 07/11/01 | $14.62 | Rickey | 400,000 | 1992 Plan |
| | | Spreng | 400,000 | 1992 Plan |
| | | Tullie | 125,000 | 1992 Plan |
| | | Bendush | 85,000 | 1992 Plan |
| | | Little | 100,000 | 1992 Plan |
| 05/28/02[5] | $6.54 | Bendush | 685,000 | 1992 Plan/Option Exchange Program |

[3]    All Exercise Prices are adjusted for stock splits and rounded to the nearest $0.01.  Options marked with (*) were granted at 110% of fair market value on the purported date of the grant.

[4]    All amounts are adjusted for stock splits.

[5]    According to the 2003 Proxy Statement, with the exception of 50,000 options granted to Little and 100,000 options granted to Sudireddy, the options granted on May 28, 2002 represented replacement options granted by the Company in connection with the Company's Option Exchange Program.  The original option was granted at a higher exercise price per share and was cancelled in November 2001 in exchange for a new option to be granted for the same number of shares at least six months and one day later.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| | | Little | 700,000 | 1992 Plan/Option Exchange Program |
|---|---|---|---|---|
| | | Rickey | 5,200,000 | 1992 Plan/Option Exchange Program |
| | | Sudireddy | 625,000 | 1992 Plan/Option Exchange Program |
| | | Tullie | 650,000 | 1992 Plan/Option Exchange Program |
| 07/1/02 | $4.27 | Bendush | 75,000 | 1992 Plan |
| | | Little | 60,000 | 1992 Plan |
| | | Rickey | 360,000 | 1992 Plan |
| | | Sudireddy | 60,000 | 1992 Plan |
| | | Tullie | 50,000 | 1992 Plan |
| 09/11/02 | $3.96 | Sudireddy | 65,000 | 1992 Plan |
| 11/30/02[6] | $4.08 | Rickey | 2,440,000 | 1992 Plan |
| 01/27/03 | $3.63 | Little | 70,000 | 1992 Plan |
| | | Sudireddy | 75,000 | 1992 Plan |
| | | Tullie | 50,000 | 1992 Plan |
| 03/31/03 | $3.32[7] | Rickey | 560,000 | 1992 Plan |
| 04/1/03 | $3.32 | Smith | 75,000 | 1992 Plan |
| 09/2/03 | $5.89 | Little | 65,000 | 1992 Plan |
| | | Smith | 50,000 | 1992 Plan |
| | | Sudireddy | 100,000 | 1992 Plan |
| | | Tullie | 65,000 | 1992 Plan |
| 12/22/03 | $5.65 | Little | 65,000 | 1992 Plan |
| | | Smith | 50,000 | 1992 Plan |
| | | Sudireddy | 100,000 | 1992 Plan |
| | | Tullie | 65,000 | 1992 Plan |
| 05/24/04 | $5.09 | Wilkie | 160,000 | 1992 Plan |
| 06/3/04 | $5.04 | Tullie | 200,000 | 1992 Plan |
| | $5.54* | Tullie | 50,000 | 1992 Plan |
| 09/2/04 | $3.29 | Pairman | 10,000 | 1992 Plan |

[6]     Although the proxy lists the grant date as November 30, 2002, that day was not a trading day.  The market price of AMCC stock on November 29, 2002 was $4.56 and the market price on December 2, 2002 was $4.90.  On December 9, 2002, the market price of AMCC stock was $4.08.

[7]     Although the market price of AMCC stock on March 31, 2003 was $3.26, the 2003 Proxy Statement indicates that Rickey was granted options on that day at an exercise price of $3.32.

| | | | | |
|---|---|---|---|---|
| | | Sudireddy | 39,000 | 1992 Plan |
| | | Tullie | 39,000 | 1992 Plan |
| | | Wilkie | 10,000 | 1992 Plan |
| | $3.62 | Pairman | 15,000 | 1992 Plan |
| | | Sudireddy | 26,000 | 1992 Plan |
| | | Tullie | 26,000 | 1992 Plan |
| | | Wilkie | 15,000 | 1992 Plan |
| | | | | |
| 02/24/05 | $3.60 | Pairman | 50,000 | 1992 Plan |
| | | Tullie | 100,000 | 1992 Plan |
| | | Wilkie | 50,000 | 1992 Plan |
| | | | | |
| 03/21/05 | $3.21 | Hooshmand | 2,200,000 | 1992 Plan |
| | $3.53* | Hooshmand | 550,000 | 1992 Plan |
| 05/31/05 | $2.86 | Lau | 234,500 | 1992 Plan or the 2000 Plan |
| | $3.15* | Lau | 115,500 | 1992 Plan or the 2000 Plan |
| | | | | |
| 06/2/05 | $2.98 | Hooshmand | 250,000 | 1992 Plan or the 2000 Plan |
| | | | | |
| 09/29/05[8] | $2.98 | Murphy | 62,000 | 1992 Plan or the 2000 Plan |
| | | Wilkie | 60,000 | 1992 Plan or the 2000 Plan |
| | | | | |
| 10/10/05 | $2.82 | Gargus | 234,500 | 1992 Plan or the 2000 Plan |
| | $3.10* | Gargus | 115,500 | 1992 Plan or the 2000 Plan |
| | | | | |
| 10/28/05 | $2.64 | Lau | 99,000 | 1992 Plan or the 2000 Plan |
| | | Pairman | 66,000 | 1992 Plan or the 2000 Plan |
| | $2.40 | Lau | 201,000 | 1992 Plan or the 2000 Plan |
| | | Pairman | 134,000 | 1992 Plan or the 2000 Plan |

159.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the Company's 1992 Plan and 2000 Plan, the exercise price of options can be no less than 100% of the fair market value of the common stock subject to the option on the date of the

---

[8]    Although the proxy lists these grants as having occurred in Fiscal Year 2006 and as having a 10-year option term, these grants are listed as having expiration dates of September 29, 2010. Plaintiffs are assuming the date is a typographical error and the actual expiration date is September 29, 2015.

grant.

160.    In each of its Form 10-K Annual Reports filed with the SEC for fiscal years 1998 through 2001, the Company represented that it followed APB 25 to account for stock-based compensation:

Stock-Based Compensation

The Company has elected to follow Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25") and related interpretations in accounting for its employee and director stock options because the alternative fair value accounting provided for under SFAS No. 123, Accounting for Stock-Based Compensation ("SFAS 123"), requires the use of option valuation models that were not developed for use in valuing employee and director stock options. Under SFAS 123 compensation cost is determined using the fair value of stock-based compensation determined as of the grant date, and is recognized over the periods in which the related services are rendered. The statement also permits companies to elect to continue using the current implicit value accounting method specified in APB 25 to account for stock-based compensation and disclose in the footnotes to the financial statements the pro forma effect of using the fair value method for its stock based compensation.

161.    The Company continued to represent its compliance with APB 25 and its adoption of the Statement of Financial Accounting Standards ("SFAS") No. 123, Accounting for Stock-Based Compensation ("SFAS 123") in its Form 10-K Annual Report filed with the SEC for fiscal year 2002 as follows:

*Stock-Based Compensation*

The Company accounts for stock-based awards to employees in accordance with Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB 25") and has adopted the disclosure-only alternative SFAS No. 123, "*Accounting for Stock-Based Compensation*" ("SFAS 123").

In March 2000, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 44, "*Accounting for Certain Transactions Involving Stock Compensation—An Interpretation of APB Opinion No. 25*" ("FIN 44"). FIN 44 clarifies the definition of an employee for purposes of applying APB 25, the criteria for determining whether a plan qualifies as a noncompensatory plan, the accounting consequence of various modifications to the terms of a previously fixed stock option or award, and the accounting for the assumption of stock compensation awards in a business combination. FIN 44 was effective July 1, 2000. The provisions of FIN 44 change the accounting for the assumption of unvested employee stock options and restricted stock awards in a purchase business combination. The new rules require that the intrinsic value of the unvested awards be allocated to deferred compensation and recognized as stock-based compensation expense over the remaining future vesting period. The Company adopted these new rules in its second quarter of fiscal 2001 for acquisitions accounted for as purchase

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

- 45 -

transactions.

162.   In its Form 10-K Annual Report filed with the SEC for fiscal year 2003, the Company continued to represent its accounting in accordance with APB 25 as follows:

**Stock-Based Compensation**

> The Company has in effect several stock option plans under which non-qualified and incentive stock options have been granted to employees and non-employee directors. The Company also has in effect an employee stock purchase plan (Note 6). The Company accounts for stock-based awards to employees in accordance with Accounting Principles Board Opinion No. 25,  *"Accounting for Stock Issued to Employees"*  ("APB 25") and the related Interpretation No. 44, *"Accounting for Certain Transactions Involving Stock Compensation – An Interpretation of APB Opinion No. 25".*  The Company has adopted the disclosure-only alternative of SFAS 123, *"Accounting for Stock-Based Compensation"* ("SFAS 123"), as amended by SFAS 148, *"Accounting for Stock-Based Compensation – Transition and Disclosure"* ("SFAS 148").

163.   In its Form 10-K Annual Reports filed with the SEC for fiscal year 2004 and 2005, the Company reported its continued accounting treatment of stock based compensation in accordance with APB 25:

**Stock-Based Compensation**

> The Company has in effect several stock option plans under which non-qualified and incentive stock options have been granted to employees and non-employee directors. The Company also has in effect an employee stock purchase plan. The Company accounts for stock-based awards to employees in accordance with Accounting Principles Board Opinion No. 25,  *"Accounting for Stock Issued to Employees"*  ("APB 25") and the related Interpretation No. 44, *"Accounting for Certain Transactions Involving Stock Compensation – An Interpretation of APB Opinion No. 25"* . The Company has adopted the disclosure-only alternative of SFAS 123, *"Accounting for Stock-Based Compensation"* ("SFAS 123"), as amended by SFAS 148, *"Accounting for Stock-Based Compensation – Transition and Disclosure"* ("SFAS 148").

164.   Pursuant to the APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

165.   Pursuant to Section 162(m) of the IRC, compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material

terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

166.   In a striking pattern that could not have been the result of chance, most of the foregoing stock option grants were dated within 60 trading days prior to a substantial rise in AMCC's stock price, as demonstrated in the following tables and charts:

| Purported Date of Grant | Exercise Price | Stock Price 5 Trading Days After Purported Grant Date | % Rise in Stock Price 5 Trading Days After Purported Grant Date |
|---|---|---|---|
| 10/30/00 | $64.06 | $76.38 | 19.23% |
| 12/21/00 | $53.88 | $75.05 | 39.30% |
| 07/11/01 | $14.62 | $17.00 | 16.28% |
| 06/03/04 | $5.04 | $ 5.28 | 4.76% |

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days After Purported Grant Date | % Rise in Stock Price 10 Trading Days After Purported Grant Date |
|---|---|---|---|
| 07/01/02 | $4.27 | $ 4.90 | 14.75% |
| 05/24/04 | $5.09 | $ 5.52 | 8.45% |

| Purported Date of Grant | Exercise Price | Stock Price 20 Trading Days After Purported Grant Date | % Rise in Stock Price 20 Trading Days After Purported Grant Date |
|---|---|---|---|
| 03/27/98 | $5.91 | $ 6.25 | 5.75% |
| 12/22/03 | $5.65 | $7.75 | 37.17% |

| Purported Date of Grant | Exercise Price | Stock Price 40 Trading Days After Purported Grant Date | % Rise in Stock Price 40 Trading Days After Purported Grant Date |
|---|---|---|---|
| 01/19/00 | $71.97 | $118.09 | 64.08% |
| 09/11/02 | $ 3.96 | $ 5.02 | 26.77% |

| Purported Date of Grant | Exercise Price | Stock Price 60 Trading Days After Purported Grant Date | % Rise in Stock Price 60 Trading Days After Purported Grant Date |
|---|---|---|---|
| 04/20/99 | $12.06 | $20.91 | 73.38% |
| 04/23/99 | $12.97 | $21.19 | 63.38% |

| 08/03/99 | $20.37 | $33.47 | 64.31% |
| 01/27/03 | $ 3.63 | $ 4.06 | 11.85% |
| 03/31/03 | $ 3.32[9] | $ 5.63 | 69.58% |
| 04/01/03 | $ 3.32 | $ 5.65 | 70.18% |
| 09/02/03 | $ 5.89 | $ 6.32 | 7.30% |
| 09/02/04 | $ 3.29 | $ 3.73 | 13.37% |

**Stock Price Performance Surrounding Option Grants Dated March 27, 1998:**



**Stock Price Performance Surrounding Option Grants Dated April 20, 1999 and April 23, 1999:**



---

9  *See* footnote 5, *supra.*

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

**Stock Price Performance Surrounding Option Grants Dated August 3, 1999:**



**Stock Price Performance Surrounding Option Grants Dated January 19, 2000:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

**Stock Price Performance Surrounding Option Grants Dated October 30, 2000:**



**Stock Price Performance Surrounding Option Grants Dated December 21, 2000:**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stock Price Performance Surrounding Options Grant Dated July 11, 2001**



**Stock Price Performance Surrounding Options Grant Dated July 1, 2002:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stock Price Performance Surrounding Options Grant Dated September 11, 2002:**



**Stock Price Performance Surrounding Option Grants Dated January 27, 2003:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

**Stock Price Performance Surrounding Option Grants
Dated March 31, 2003 and April 1, 2003:**



**Stock Price Performance Surrounding Options Grant Dated September 2, 2003:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

**Stock Price Performance Surrounding Options Grant Dated December 22, 2003:**



**Stock Price Performance Surrounding Options Grant Dated May 24, 2004:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stock Price Performance Surrounding Options Grant Dated June 3, 2004:**



**Stock Price Performance Surrounding Options Grant Dated September 2, 2004:**



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

167.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.   Rather, at the behest of the Option Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of AMCC stock was lower than the market price on the actual grant dates.   This   improper   backdating,   which   violated   the   terms   of   the   Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Option Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

### DEFENDANTS' CONDUCT CAUSED HARM TO THE COMPANY

168.    The practice of backdating options has caused the Company to suffer additional adverse consequences, including: (i) loss of revenue; (ii) restatement of its finances with a likely finding of a material weakness in its financial controls; (iii)  the drop in its stock price attributable to the market's loss of confidence in the Company's management, thus increasing the Company's cost of borrowing, and otherwise harming its operations; and (iv) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions.

169.    As a result of the backdating and other manipulation of options issued to the Option Defendants, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company.   The Company has received and will receive less money from the Option Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

### Restatement of AMCC's Financial Statements

170.    The practice of backdating stock options not only lined the pockets of the Company's executives at the direct expense of the Company, but also resulted in the overstatement of the Company's profits.   This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company.   The Company must account for the options at a lower price, and will have to restate its results to

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

1     reflect the previously unreported expenses.

2     171.    On September 14, 2006, the Audit Committee of the AMCC Board announced that

3 it had determined, with the concurrence of AMCC's outside auditors, Ernst & Young LLP, that all

4 earnings press releases and similar communications issued by the Company, relating to fiscal

5 years 1998 through 2005, as well as for the first quarter of fiscal year 2006, should **not** be relied

6 upon pending completion of the restatements.  The Audit Committee also preliminarily concluded

7 that, pursuant to the requirements of APB 25, the different accounting measurement dates for the

8 purpose of computing compensation costs for certain stock options grants awarded during fiscal

9 years 1998 through 2006 should have been used.

10     172.    AMCC has admitted that the estimated $200 million in additional non-cash stock-

11 based compensation expense beginning in fiscal year 1998 to date will have the effect of

12 decreasing reported net income or increasing reported net loss, and increasing the reported

13 accumulated deficit and additional paid-in capital figures contained in the Company's historical

14 financial statements for the Relevant Period.

15     173.    AMCC has admitted that the Company will restate its historical financial results

16 going back eight fiscal years – to its Initial Public Offering in November 1997.  For example, the

17 Company's income for the fiscal years 1998 through 2005 was materially overstated because it

18 failed to account for reported stock-based compensation expenses.  AMCC has advised

19 shareholders and the market that as a result, its public statements from fiscal years 1998 to date

20 may no longer be relied upon, and it must continue to delay (as the Company did for the first

21 quarter of fiscal year 2007) filing all quarterly and annual reports going forward.

22     174.    In addition to the serious and adverse tax consequences, which resulted from the

23 Company's failure to record $200 million additional non-cash stock-based compensation, AMCC

24 faces millions in costs associated with the Audit Committee's review and the related restatements.

25 AMCC also will likely admit to material weakness in its financial controls resulting in a qualified

26 opinion from its outside auditor.

27 **Materially False and Misleading SEC Filings**

28     175.    As a result of Defendants' conduct, the financial information contained in AMCC's

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 Annual Reports on Form 10-K filed with SEC (the "Form 10-K") on June 15, 1998 (and amended on October 15, 1998), June 24, 1999, June 28, 2000, May 23, 2001, June 5, 2002, June 5, 2003, June 10, 2004, June 7, 2005, and signed by certain Defendants are false and misleading.  In the Form 10-Ks AMCC represented that the Company's net income in 1998, 1999, 2000, 2001, 2002, 2003, 2004 was $15.216M, $17.133M, $48.625M, $(436.215M), $(3.605B), $(745.541M), $(104.877M), and $(127.373M), respectively.

176.    As a result of Defendants' conduct, the foregoing representations in the Form 10-K were materially false and misleading when made because they failed to disclose that:

a.   The Company's reported stock-based compensation expense for fiscal years 1998 through 2005 was materially understated as a consequence of the stock option backdating scheme;

b.   The Company's income for fiscal years 2000 through 2005 was materially overstated because it failed to account for the Company's true stock-based compensation expense over those years;  and

c.   The Company's disclosure controls and procedures were not adequate.

177.    Based on its admissions to date, AMCC will likely admit that its internal control functions were inadequate.  But, in the Company's Form 10-K Annual Reports filed with the SEC for fiscal years 2003 through 2005, the Company represented that its management, after evaluating the Company's "disclosure controls and procedures," found them to be adequate.

178.    For example, in the most recent Form 10-K, filed for fiscal year 2005 on June 7, 2005, the Company reported:

**Item 9A.        Controls and Procedures.**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Our chief executive officer and chief financial officer performed an evaluation of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934) as of March 31, 2005. Based on that evaluation, our chief executive officer and chief financial officer concluded that *our disclosure controls and procedures were effective and sufficient* to ensure that the information required to be disclosed in the reports that we file under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act

Rule 13a-15(f). Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework set forth in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework set forth in *Internal Control – Integrated Framework*, our management concluded that ***our internal control over financial reporting was effective as of March 31, 2005.*** (emphasis added).

179.   The 2003, 2004 and 2005 Form 10-Ks included certifications signed by Defendants Rickey, Smith, Hooshmand, and the Company's current CFO Jeffrey Blazevich, pursuant to Sections 302 and 906 of SOX, which attested to the purported accuracy of the financial statements contained therein, the effectiveness of its internal controls, and compliance with Section 13(a) of the Exchange Act.  Based on admissions by the Audit Committee, as well as its preliminary review, the certifications signed by these Defendants pursuant to Sections 302 and 906 of SOX were false.  The Company's controls and procedures as to stock option grants were inadequate and Defendants Rickey, Smith and Hooshmand used these inadequacies for their own benefit.

180.   As a result of Defendants' improper backdating, the Company falsely represented that it used the fair value on the date of the grant to account for stock based compensation, and its SEC filings misrepresented stock-based compensation expenses.  For example, in its Form 10-K Annual Report for fiscal year 1998 filed with the SEC on June 15, 1998 and amended on October 15, 1998, the Company reported as follows:

> From April 1, 1997 through September 30, 1997, the Company recorded deferred compensation expense for the difference between the exercise price and the fair value for financial statement presentation purposes of the Company's common stock, as determined by the Board of Directors, for all options granted in the first and second quarters of fiscal 1998. This deferred compensation aggregates to $599,000, which is being amortized over the four year vesting period of the related options. Amortization during fiscal 1998 was $127,000.

181.   Again, in its Form 10-K Annual Report filed with the SEC for fiscal year 1999, the Company reported as follows:

> From April 1, 1997 through September 30, 1997, the Company recorded deferred compensation expense for the difference between the exercise price and the fair value for financial statement presentation purposes of the Company's Common Stock, as determined by the Board of Directors, for all options granted in the period. This deferred compensation aggregates to $599,000, which is being amortized ratably over the four year vesting period of the related options. Additionally, during the year ended March 31, 1999, the Company recorded

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

deferred compensation related to restricted stock and stock options granted to founders and employees of Cimaron of $2.5 million. Such amount is being amortized over the related vesting period, generally five years. Amortization of deferred compensation during fiscal years 1998 and 1999 was $127,000 and $860,000, respectively.

182. In its Form 10-K Annual Report filed with the SEC for fiscal year 2000, the Company reported as follows:

From April 1, 1997 through September 30, 1997, the Company recorded deferred compensation expense for the difference between the exercise price and the fair value for financial statement presentation purposes of the Company's common stock, as determined by the Board of Directors, for all options granted in the period. This deferred compensation aggregates to $599,000, which is being amortized ratably over the four year vesting period of the related options. Additionally, during the year ended March 31, 1999, the Company recorded deferred compensation related to restricted stock and stock options granted to founders and employees of Cimaron of $2.5 million. Such amount is being amortized over the related vesting period, generally five years. Amortization of deferred compensation during fiscal years 1998, 1999 and 2000 was $127,000, $860,000 and $611,000, respectively.

183. In its Form 10-K Annual Report filed with the SEC for fiscal year 2001, the Company reported as follows:

Stock-based Compensation. During the year ended March 31, 2001, deferred compensation of $438.8 million was recorded related to restricted stock and unvested options granted to employees of acquired companies in accordance with FASB Interpretation No. 44 ("FIN 44"). ...Stock-based compensation charges were $79.7 million and $0.5 million for the years ended March 31, 2001 and March 31, 2000, respectively. ...We currently expect to record amortization of deferred compensation with respect to these option grants of approximately $147.2 million, $134.1 million, $63.5 million, and $4.1 million during the fiscal years ended March 31, 2002, 2003, 2004 and 2005, respectively.

184. In its Form 10-K Annual Report filed with the SEC for fiscal year 2002, the Company reported as follows:

*Stock-based Compensation.* Stock-based compensation expense represents the amortization of deferred compensation. Deferred compensation is the difference between the fair value of our common stock at the date of each acquisition and the exercise price of the unvested stock options assumed in the acquisition. In fiscal 2001, we recorded approximately $438.8 million of deferred compensation, in connection with stock options assumed in our purchase acquisitions. Stock-based compensation charges were $147.1 million and $79.7 million for the years ended March 31, 2002 and 2001, respectively. The increase is directly related to our acquisitions in fiscal 2001. We currently expect to record amortization of deferred compensation with respect to these assumed options of approximately $136.4 million, $33.6 million, and $495,000 during the fiscal years ended March 31, 2003, 2004, and 2005, respectively.

185.    In its Form 10-K Annual Report filed with the SEC for fiscal year 2003, the Company reported as follows:

> *Stock-Based Compensation.*  Stock-based compensation expense represents the amortization of deferred compensation related to acquisitions. Deferred compensation is the difference between the fair value of our common stock at the date of each acquisition and the exercise price of the unvested stock options assumed in the acquisition. In fiscal 2001, we recorded approximately $438.8 million of deferred compensation, in connection with stock options assumed in our purchase acquisitions. Stock-based compensation charges, including amounts charged to cost of revenues, were $131.9 million and $147.1 million for the years ended March 31, 2003 and 2002, respectively. We currently expect to record amortization of deferred compensation with respect to these assumed options of approximately $22.8 million and $387,000 during the fiscal years ending March 31, 2004 and 2005, respectively.

186.    In its Form 10-K Annual Report filed with the SEC for fiscal year 2004, the Company reported as follows:

> Stock-based compensation expense represents the amortization of deferred compensation related to acquisitions. Deferred compensation is the difference between the fair value of our common stock at the date of each acquisition and the exercise price of the unvested stock options assumed in the acquisition. In the third quarter of fiscal 2004, we recorded approximately $4.2 million of deferred compensation in connection with stock options assumed in our purchase acquisition of JNI Corporation. Stock-based compensation charges, including amounts charged to cost of revenues, were $21.2 million for the year ended March 31, 2004, compared to $131.9 million for the year ended March 31, 2003. We currently expect to record amortization of deferred compensation with respect to these assumed options of approximately $1.4 million, $1.2 million and $195,000 for fiscal years 2005, 2006 and 2007, respectively.

187.    In its Form 10-K Annual Report filed with the SEC for fiscal year 2005, the Company reported as follows:

> Stock-based compensation expense represents the amortization of deferred compensation related to acquisitions. Deferred compensation is the difference between the fair value of our common stock at the date of each acquisition and the exercise price of the unvested stock options assumed in the acquisition. In fiscal 2005, we recorded approximately $19.0 million of deferred compensation in connection with stock options assumed in our acquisition of 3ware. Stock-based compensation charges, including amounts charged to cost of revenues, were $9.3 million for the year ended March 31, 2005, compared to $21.2 million for the year ended March 31, 2004. We currently expect to record amortization of deferred compensation with respect to these assumed options of approximately $6.1 million in fiscal 2006, $2.8 million in fiscal 2007, and $200,000 in fiscal 2008.

188.    Defendants also caused AMCC to file proxy statements with the SEC on June 15, 1998, June 23, 1999, July 10, 2000, July 12, 2001, July 10, 2002, July 17, 2003, July 16, 2004, July 11, 2005, and April 16, 2006 (the "Proxy Statements"). The Proxy Statements sought

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

shareholder approval for the election or re-election of each of the Director Defendants named herein.

189.     Each of the Proxy Statements purported to describe the compensation of the directors and, with respect to stock option grants granted to relevant Defendants, the Proxy Statements stated that the options granted were based on the fair market value of AMCC's common stock on the grant date.  (*See* Options Chart, ¶158, *supra*).

190.     The representations in the Proxy Statements referenced above were materially false and misleading because they failed to disclose that:

       a.      The dates on options granted to employees, including the Defendants who were up for board reelection, were backdated to favor the grantees;

       b.      The Company did not calculate the exercise price of options using the method stated in the Proxy Statement;

       c.      The Company's internal controls and accounting practices were inadequate and the Company did not have policies and practices to promote good corporate governance; and

       d.      The Compensation and Audit Committees did not adequately perform their function because top executives were allowed to manipulate the Company's stock option grant programs to their benefit since 1998.

191.     Furthermore, AMCC's executives, including Defendants Rickey, Holliday, Tullie, Gal, Bendush, Clark, Little, Winner, Sudireddy, Spreng, Lau, Wilkie, and Murphy, were overpaid improper cash bonuses based on the aforementioned false and misleading financial information and should be repaid to the Company.  *See* ¶¶30, 40, 45, 60, 64, 72,76, 80, 84, 88, 92, 100, 107 110, *supra*.  The AMCC Board also continued to inflate or maintain the share price of AMCC common stock to preserve the value of misdated options given to its officers and directors through the Share Repurchase Program adopted in August 2004.

**Insider Sales and Improper Profits**

192.     In disregard of their duties of trust and fidelity, during the Relevant Period, while in the possession of materially adverse non-public information regarding the Company, AMCC insiders Bedi, Bendush, Bowes, Clark, Gal, Ghest, Holliday, Little, Pairman, Raza, Rickey, Smith, Smullen, Spreng, Stabenow, Sudireddy, Tullie and Winner (collectively the "Insider Selling

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

Defendants") sold or acquiesced in and/or permitted the sale of significant amounts of Company stock by the officers, directors and/or insiders of the Company.   Director Defendants were motivated to engage in the wrongdoing alleged herein because it allowed AMCC insiders to sell their shares at artificially inflated prices during the relevant period.   The backdating scheme allowed the Insider Selling Defendants to sell AMCC stock obtained through options exercises for greater profit.

193.    From March 11, 1998 to the present, upon information and belief, the Insider Selling Defendants herein, sold a total of 6,762,141 shares of AMCC common stock for gross proceeds of approximately $534,319,788.07.

**Defendant Bedi**

194.    During the Relevant Period, Option Defendant Bedi sold a total of 111,065 shares of AMCC common stock, accumulating $3,733,690.21 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 05/07/1998 | 40,000 | $26.00 | $1,040,000.00 |
| 08/18/1998 | 5,000 | $25.77 | $   128,850.00 |
| 10/27/1998 | 5,000 | $23.00 | $   115,000.00 |
| 11/03/1998 | 5,000 | $24.94 | $   124,687.50 |
| 11/04/1998 | 2,000 | $26.38 | $     52,750.00 |
| 11/11/1998 | 300 | $29.94 | $       8,981.25 |
| 11/12/1998 | 4,723 | $29.94 | $   141,394.81 |
| 11/19/1998 | 4,000 | $33.83 | $   135,300.00 |
| 01/21/1999 | 20,000 | $45.00 | $   900,000.00 |
| 01/21/1999 | 10,000 | $45.43 | $   454,250.00 |
| 01/26/1999 | 7,750 | $42.28 | $   327,674.65 |
| 01/28/1999 | 2,562 | $42.25 | $   108,244.50 |
| 02/01/1999 | 4,000 | $42.25 | $   169,000.00 |
| 02/17/1999 | 730 | $37.75 | $     27,557.50 |
| **Total** | **111,065** | | **$3,733,690.21** |

**Defendant Bendush**

195.    During the Relevant Period, Option Defendant Bendush sold a total of 240,000 shares of AMCC common stock, accumulating $30,467,500.00 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 04/25/2000 | 40,000 | $100.00 | $ 4,000,000.00 |
| 04/28/2000 | 20,000 | $121.00 | $ 2,420,000.00 |
| 07/17/2000 | 25,000 | $156.00 | $ 3,900,000.00 |
| 07/17/2000 | 15,000 | $156.63 | $ 2,349,375.00 |
| 08/31/2000 | 10,000 | $199.00 | $ 1,990,000.00 |
| 08/31/2000 | 10,000 | $199.13 | $ 1,991,250.00 |
| 10/16/2000 | 5,000 | $185.00 | $ 925,000.00 |
| 10/16/2000 | 5,000 | $185.25 | $ 926,250.00 |
| 10/16/2000 | 5,000 | $185.75 | $ 928,750.00 |
| 10/16/2000 | 5,000 | $185.88 | $ 929,375.00 |
| 10/19/2000 | 10,000 | $185.00 | $ 1,850,000.00 |
| 10/19/2000 | 10,000 | $185.75 | $ 1,857,500.00 |
| 01/18/2001 | 80,000 | $ 80.00 | $ 6,400,000.00 |
| **Total** | **240,000** | | **$30,467,500.00** |

**Defendant Bowes**

196.    During the Relevant Period, Director Defendant Bowes sold a total of 184,520 shares of AMCC common stock, accumulating $10,390,732.72 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 03/11/1998 | 53,336 | $ 19.38 | $ 1,033,385.00 |
| 11/30/1998 | 26,389 | $ 33.50 | $ 884,031.50 |
| 11/30/1998 | 26,389 | $ 33.50 | $ 884,031.50 |
| 07/21/1999 | 11,111 | $ 84.00 | $ 933,324.00 |
| 08/13/1999 | 17,295 | $ 93.11 | $ 1,610,335.72 |
| 05/31/2000 | 50,000 | $100.91 | $ 5,045,625.00 |
| **Total** | **184,520** | | **$10,390,732.72** |

**Defendant Clark**

197.    During the Relevant Period, Option Defendant Clark sold a total of 243,333 shares of AMCC common stock, accumulating $21,596,658.95 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 10/19/1998 | 10,000 | $20.13 | $ 201,250.00 |
| 10/20/1998 | 5,000 | $20.94 | $ 104,687.50 |
| 10/21/1998 | 5,000 | $19.00 | $ 95,000.00 |
| 10/21/1998 | 5,000 | $20.31 | $ 101,562.50 |
| 10/21/1999 | 6,250 | $45.13 | $ 282,031.25 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 10/21/1999 | 3,000 | $45.88 | $ 137,625.00 |
| 10/21/1999 | 1,875 | $46.00 | $ 86,250.00 |
| 10/21/1999 | 750 | $45.13 | $ 33,843.75 |
| 04/27/1999 | 8,125 | $54.80 | $ 445,234.56 |
| 05/03/1999 | 2,708 | $54.25 | $ 146,909.00 |
| 08/02/1999 | 10,625 | $93.06 | $ 988,781.63 |
| 11/01/1999 | 20,001 | $76.61 | $ 1,532,182.61 |
| 01/18/2000 | 13,333 | $144.06 | $ 1,920,790.65 |
| 02/01/2000 | 4,167 | $148.36 | $ 618,216.12 |
| 02/01/2000 | 1,250 | $148.36 | $ 185,450.00 |
| 02/01/2000 | 1,250 | $148.36 | $ 185,450.00 |
| 05/01/2000 | 24,999 | $131.62 | $ 3,290,468.38 |
| 05/01/2000 | 7,500 | $131.62 | $ 987,180.00 |
| 05/01/2000 | 7,500 | $131.62 | $ 987,180.00 |
| 08/01/2000 | 10,000 | $145.00 | $ 1,450,000.00 |
| 08/01/2000 | 7,500 | $146.50 | $ 1,098,750.00 |
| 08/01/2000 | 5,000 | $146.75 | $ 733,750.00 |
| 08/01/2000 | 2,500 | $146.50 | $ 366,250.00 |
| 11/08/2000 | 50,000 | $ 70.22 | $ 3,511,135.00 |
| 11/08/2000 | 15,000 | $ 70.22 | $ 1,053,340.50 |
| 11/08/2000 | 15,000 | $ 70.22 | $ 1,053,340.50 |
| **Total** | **243,333** | | **$21,596,658.95** |

**Defendant Gal**

198.   During the Relevant Period, Option Defendant Gal sold a total of 159,100 shares of AMCC common stock, accumulating $4,998,871.88 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 05/07/1998 | 60,000 | $26.00 | $1,560,000.00 |
| 05/07/1998 | 60,000 | $26.00 | $1,560,000.00 |
| 08/17/1998 | 4,000 | $25.00 | $ 100,000.00 |
| 09/25/1998 | 500 | $16.69 | $ 8,343.75 |
| 10/15/1998 | 450 | $19.00 | $ 8,550.00 |
| 10/15/1998 | 200 | $19.13 | $ 3,825.00 |
| 04/23/1999 | 20,000 | $50.69 | $1,013,750.00 |
| 04/26/1999 | 8,750 | $53.69 | $ 469,765.63 |
| 04/26/1999 | 200 | $55.38 | $ 11,075.00 |
| 04/27/1999 | 5,000 | $52.71 | $ 263,562.50 |
| **Total** | **159,100** | | **$4,998,871.88** |

**Defendant Ghest**

199.   During the Relevant Period, Director Defendant Ghest sold a total of 70,000 shares of AMCC common stock, accumulating $6,045,713.20 in proceeds.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 04/27/1999 | 8,910 | $ 52.71 | $ 469,614.02 |
| 04/30/1999 | 2,560 | $ 52.44 | $ 134,240.00 |
| 05/03/1999 | 4,080 | $ 53.94 | $ 220,065.00 |
| 05/04/1999 | 9,450 | $ 54.05 | $ 510,795.18 |
| 08/31/1999 | 3,000 | $ 92.38 | $ 277,125.00 |
| 11/02/1999 | 6,000 | $ 79.50 | $ 477,000.00 |
| 01/18/2000 | 6,000 | $146.31 | $ 877,875.00 |
| 05/16/2000 | 10,000 | $115.09 | $1,150,875.00 |
| 05/30/2000 | 20,000 | $ 96.41 | $1,928,124.00 |
| **Total** | **70,000** | | **$6,045,713.20** |

**Defendant Holliday**

200.    During the Relevant Period, Option Defendant Holliday sold a total of 427,666 shares of AMCC common stock, accumulating $16,191,386.56 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 05/07/1998 | 25,000 | $26.00 | $ 650,000.00 |
| 05/07/1998 | 10,000 | $26.00 | $ 260,000.00 |
| 07/21/1998 | 10,000 | $26.78 | $ 267,813.00 |
| 07/21/1998 | 5,000 | $26.94 | $ 134,687.50 |
| 07/22/1998 | 5,000 | $26.44 | $ 132,187.50 |
| 07/22/1998 | 2,500 | $26.50 | $ 66,250.00 |
| 08/04/1998 | 5,000 | $24.94 | $ 124,687.50 |
| 08/04/1998 | 2,500 | $24.94 | $ 62,343.75 |
| 08/07/1998 | 25,000 | $25.06 | $ 626,562.50 |
| 08/07/1998 | 5,000 | $24.94 | $ 124,687.50 |
| 08/11/1998 | 3,000 | $24.81 | $ 74,437.50 |
| 08/12/1998 | 22,000 | $24.87 | $ 547,124.60 |
| 08/19/1998 | 10,000 | $26.06 | $ 260,625.00 |
| 10/20/1998 | 5,000 | $21.19 | $ 105,937.50 |
| 10/21/1998 | 17,500 | $20.15 | $ 352,656.50 |
| 10/22/1998 | 20,000 | $20.84 | $ 416,876.00 |
| 10/22/1998 | 2,500 | $20.19 | $ 50,468.75 |
| 10/23/1998 | 5,000 | $21.13 | $ 105,625.00 |
| 10/26/1998 | 20,000 | $21.53 | $ 430,626.00 |
| 11/18/1998 | 1,000 | $31.94 | $ 31,937.50 |
| 11/19/1998 | 15,000 | $32.27 | $ 484,062.00 |
| 11/25/1998 | 10,000 | $32.86 | $ 328,625.00 |
| 01/26/1999 | 6,666 | $42.69 | $ 284,554.88 |
| 02/01/1999 | 30,000 | $42.17 | $ 1,265,001.00 |
| 02/02/1999 | 5,000 | $42.81 | $ 214,062.50 |
| 02/03/1999 | 30,000 | $42.50 | $ 1,275,000.00 |

| Date | # of Shares | Price per Share | Proceeds |
|---|---|---|---|
| 02/04/1999 | 5,000 | $42.69 | $ 213,437.50 |
| 04/27/1999 | 13,210 | $53.15 | $ 702,153.77 |
| 04/29/1999 | 3,340 | $50.44 | $ 168,461.25 |
| 04/30/1999 | 3,080 | $52.44 | $ 161,507.50 |
| 05/03/1999 | 4,880 | $53.94 | $ 263,215.00 |
| 05/04/1999 | 49,722 | $54.03 | $ 2,686,678.55 |
| 05/05/1999 | 25,768 | $53.46 | $ 1,377,531.51 |
| 10/29/1999 | 25,000 | $77.66 | $ 1,941,562.50 |
| **Total** | **427,666** | | **$16,191,386.56** |

## Defendant Little

201.  During the Relevant Period, Option Defendant Little sold a total of 106,630 shares of AMCC common stock, accumulating $7,459,578.10 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 04/27/1999 | 5,000 | $ 54.50 | $ 272,500.00 |
| 08/02/1999 | 630 | $ 98.20 | $ 61,862.85 |
| 02/01/2000 | 3,500 | $155.00 | $ 542,500.00 |
| 02/04/2000 | 1,500 | $184.94 | $ 277,406.25 |
| 05/30/2000 | 7,000 | $100.25 | $ 701,750.00 |
| 05/31/2000 | 3,000 | $100.75 | $ 302,250.00 |
| 08/14/2000 | 2,000 | $159.90 | $ 319,800.00 |
| 08/30/2000 | 4,000 | $199.50 | $ 798,000.00 |
| 01/18/2001 | 50,000 | $ 81.00 | $4,050,000.00 |
| 11/21/2002 | 30,000 | $ 4.45 | $ 133,509.00 |
| **Total** | **106,630** | | **$7,459,578.10** |

## Defendant Pairman

202.  During the Relevant Period, Option Defendant Pairman sold a total of 574,193 shares of AMCC common stock, accumulating $2,038,055.65 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 08/25/2004 | 100,000 | $3.50 | $ 350,000.00 |
| 10/28/2004 | 40,000 | $3.60 | $ 144,000.00 |
| 10/28/2004 | 10,000 | $3.55 | $ 35,500.00 |
| 11/30/2004 | 124,193 | $3.70 | $ 459,961.19 |
| 02/07/2006 | 22,000 | $3.43 | $ 75,460.00 |
| 02/07/2006 | 20,000 | $3.44 | $ 68,800.00 |
| 02/07/2006 | 3,000 | $3.45 | $ 10,350.00 |
| 02/07/2006 | 2,000 | $3.44 | $ 6,876.00 |
| 02/07/2006 | 1,000 | $3.44 | $ 3,442.00 |
| 02/07/2006 | 1,000 | $3.43 | $ 3,432.70 |
| 02/07/2006 | 1,000 | $3.43 | $ 3,432.00 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| | | | |
|---|---|---|---|
| 02/08/2006 | 125,802 | $3.50 | $    440,307.00 |
| 02/08/2006 | 70,000 | $3.51 | $    245,700.00 |
| 02/08/2006 | 32,198 | $3.52 | $    113,336.96 |
| 02/08/2006 | 13,000 | $3.53 | $      45,890.00 |
| 02/08/2006 | 2,000 | $3.51 | $        7,018.00 |
| 02/08/2006 | 1,000 | $3.51 | $        3,511.00 |
| 02/08/2006 | 1,000 | $3.51 | $        3,508.00 |
| 02/08/2006 | 1,000 | $3.50 | $        3,501.00 |
| 02/08/2006 | 1,000 | $3.51 | $        3,507.40 |
| 02/08/2006 | 1,000 | $3.50 | $        3,501.60 |
| 02/08/2006 | 1,000 | $3.50 | $        3,500.40 |
| 02/08/2006 | 1,000 | $3.52 | $        3,520.40 |
| **Total** | **574,193** | | **$2,038,055.65** |

**Defendant Raza**

203.    During the Relevant Period, Director Defendant Raza sold a total of 45,666 shares of AMCC common stock, accumulating $8,121,936.12 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 11/15/1999 | 4,167 | $  88.35 | $    368,133.62 |
| 11/15/1999 | 4,000 | $  86.94 | $    347,750.00 |
| 08/30/2000 | 37,499 | $197.50 | $7,406,052.50 |
| **Total** | **45,666** | | **$8,121,936.12** |

**Defendant Rickey**

204.    During the Relevant Period, Option Defendant Rickey sold a total of 2,225,269 shares of AMCC common stock, accumulating $193,799,696.72 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 05/07/1998 | 26,666 | $  26.00 | $    693,316.00 |
| 08/04/1998 | 15,000 | $  25.00 | $    375,000.00 |
| 08/07/1998 | 22,700 | $  25.14 | $    570,625.79 |
| 08/12/1998 | 62,300 | $  24.94 | $1,553,749.54 |
| 08/17/1998 | 12,500 | $  25.03 | $    312,812.50 |
| 10/20/1998 | 125,000 | $  21.15 | $2,643,750.00 |
| 10/20/1998 | 12,500 | $  21.15 | $    264,375.00 |
| 10/27/1998 | 12,500 | $  22.84 | $    285,468.75 |
| 10/28/1998 | 10,000 | $  22.88 | $    228,750.00 |
| 10/29/1998 | 5,000 | $  22.81 | $    114,062.50 |
| 10/30/1998 | 10,000 | $  23.31 | $    233,125.00 |
| 10/30/1998 | 1,000 | $  23.31 | $      23,312.50 |
| 11/16/1998 | 25,000 | $  30.66 | $    766,562.50 |
| 11/20/1998 | 15,000 | $  33.44 | $    501,562.50 |
| 01/21/1999 | 30,000 | $  45.00 | $1,350,000.00 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| | | | |
|---|---|---|---|
| 01/26/1999 | 15,000 | $ 42.69 | $ 640,312.50 |
| 01/28/1999 | 5,000 | $ 42.19 | $ 210,937.50 |
| 04/29/1999 | 11,100 | $ 50.44 | $ 559,856.25 |
| 04/30/1999 | 9,240 | $ 52.44 | $ 484,522.50 |
| 05/03/1999 | 16,320 | $ 54.25 | $ 885,360.00 |
| 05/03/1999 | 16,320 | $ 53.94 | $ 880,260.00 |
| 05/04/1999 | 21,320 | $ 54.12 | $1,153,874.64 |
| 05/04/1999 | 21,320 | $ 54.13 | $1,154,087.84 |
| 05/19/1999 | 12,500 | $ 54.94 | $ 686,718.75 |
| 05/20/1999 | 7,500 | $ 55.44 | $ 415,781.25 |
| 07/19/1999 | 25,000 | $ 91.84 | $2,295,875.00 |
| 08/23/1999 | 10,000 | $ 94.03 | $ 940,313.00 |
| 08/24/1999 | 5,000 | $ 95.69 | $ 478,437.50 |
| 08/26/1999 | 10,000 | $ 97.06 | $ 970,625.00 |
| 10/15/1999 | 25,000 | $ 63.00 | $ 1,575,000.00 |
| 10/15/1999 | 5,000 | $ 63.06 | $ 315,312.50 |
| 10/26/1999 | 25,000 | $ 66.65 | $ 1,666,250.00 |
| 10/26/1999 | 8,500 | $ 66.77 | $ 567,519.50 |
| 10/27/1999 | 6,500 | $ 65.44 | $ 425,343.75 |
| 10/29/1999 | 25,000 | $ 77.19 | $ 1,929,687.50 |
| 11/09/1999 | 25,000 | $ 82.50 | $ 2,062,500.00 |
| 11/09/1999 | 1,200 | $ 82.75 | $ 99,300.00 |
| 11/09/1999 | 1,200 | $ 82.75 | $ 99,300.00 |
| 11/09/1999 | 1,200 | $ 82.75 | $ 99,300.00 |
| 11/09/1999 | 1,200 | $ 92.75 | $ 111,300.00 |
| 11/23/1999 | 25,000 | $ 85.00 | $ 2,125,000.00 |
| 01/14/2000 | 75,000 | $144.60 | $10,844,685.00 |
| 01/18/2000 | 20,000 | $144.98 | $ 2,899,688.00 |
| 01/19/2000 | 5,000 | $143.88 | $ 719,375.00 |
| 02/11/2000 | 42,500 | $230.25 | $ 9,785,467.75 |
| 02/14/2000 | 25,000 | $218.66 | $ 5,466,562.50 |
| 02/15/2000 | 65,000 | $224.36 | $14,583,686.00 |
| 02/15/2000 | 15,000 | $230.88 | $ 3,463,125.00 |
| 02/15/2000 | 10,000 | $228.06 | $ 2,280,625.00 |
| 02/15/2000 | 7,500 | $224.36 | $ 1,682,733.00 |
| 02/16/2000 | 7,500 | $232.25 | $ 1,741,875.00 |
| 04/28/2000 | 50,000 | $127.45 | $ 6,372,500.00 |
| 05/05/2000 | 10,000 | $117.81 | $ 1,178,125.00 |
| 05/12/2000 | 30,000 | $104.94 | $ 3,148,125.00 |
| 05/15/2000 | 60,000 | $101.04 | $ 6,062,502.00 |
| 05/16/2000 | 50,000 | $112.24 | $ 5,611,875.00 |
| 05/17/2000 | 35,000 | $109.29 | $ 3,825,311.00 |
| 05/18/2000 | 10,000 | $107.56 | $ 1,075,625.00 |
| 05/30/2000 | 55,000 | $ 99.99 | $ 5,499,532.50 |
| 07/17/2000 | 70,000 | $159.81 | $11,186,546.00 |
| 07/17/2000 | 10,000 | $159.81 | $ 1,598,078.00 |
| 07/20/2000 | 20,000 | $158.16 | $ 3,163,126.00 |
| 07/21/2000 | 100,000 | $162.55 | $16,255,000.00 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

| | | | |
|---|---|---|---|
| 07/25/2000 | 30,000 | $169.26 | $ 5,077,812.00 |
| 07/25/2000 | 10,000 | $167.94 | $ 1,679,375.00 |
| 07/25/2000 | 8,081 | $168.56 | $ 1,362,153.56 |
| 07/25/2000 | 1,919 | $168.56 | $   323,471.44 |
| 08/04/2000 | 10,000 | $136.50 | $ 1,365,000.00 |
| 08/04/2000 | 5,256 | $139.06 | $   730,912.50 |
| 08/04/2000 | 3,333 | $139.06 | $   463,495.31 |
| 08/04/2000 | 1,411 | $137.72 | $   194,321.23 |
| 08/09/2000 | 30,000 | $154.69 | $ 4,640,625.00 |
| 10/16/2000 | 26,487 | $178.20 | $ 4,719,983.40 |
| 10/16/2000 | 10,513 | $178.20 | $ 1,873,416.60 |
| 11/01/2000 | 27,027 | $ 72.70 | $ 1,964,954.79 |
| 11/01/2000 | 10,512 | $ 72.70 | $   764,258.14 |
| 01/18/2001 | 92,642 | $ 80.13 | $ 7,422,940.25 |
| 01/18/2001 | 53,333 | $ 80.13 | $ 4,273,306.63 |
| 01/18/2001 | 21,025 | $ 80.13 | $ 1,684,628.13 |
| 02/01/2001 | 26,667 | $ 70.21 | $ 1,872,298.07 |
| 02/01/2001 | 10,512 | $ 70.21 | $     38,050.67 |
| 02/01/2001 | 2,820 | $ 70.21 | $   197,993.05 |
| 02/01/2001 | 645 | $ 70.21 | $     45,285.64 |
| 02/02/2005 | 100,000 | $   3.49 | $   348,750.00 |
| 02/03/2005 | 250,000 | $   3.45 | $   863,250.00 |
| **Total** | **2,225,269** | | **$193,799,696.72** |

**Defendant Smith**

205.   During the Relevant Period, Option Defendant Smith sold a total of 95,000 shares of AMCC common stock, accumulating $14,698,560.00 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 10/16/2000 | 75,000 | $176.27 | $13,220,310.00 |
| 01/26/2001 | 20,000 | $ 73.91 | $ 1,478,250.00 |
| **Total** | **95,000** | | **$14,698,560.00** |

**Defendant Smullen**

206.   During the Relevant Period, Director Defendant Smullen sold a total of 771,336 shares of AMCC common stock, accumulating $83,510,072.51 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 08/27/1998 | 5,000 | $ 21.59 | $   107,937.50 |
| 08/28/1998 | 5,000 | $ 20.60 | $   103,000.00 |
| 08/31/1998 | 10,000 | $ 19.59 | $   195,875.00 |
| 11/11/1998 | 15,000 | $ 29.71 | $   445,624.50 |
| 11/11/1998 | 5,000 | $ 28.94 | $   144,687.50 |
| 01/29/1999 | 5,000 | $ 42.06 | $   210,312.50 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| 02/02/1999 | 10,000 | $ 42.13 | $    421,250.00 |
| 02/02/1999 | 5,000 | $ 42.81 | $    214,062.50 |
| 10/29/1999 | 100,000 | $ 77.49 | $ 7,748,750.00 |
| 02/04/2000 | 50,000 | $183.43 | $ 9,171,690.00 |
| 02/15/2000 | 50,000 | $227.80 | $11,390,000.00 |
| 05/24/2000 | 60,000 | $ 93.56 | $ 5,613,750.00 |
| 07/20/2000 | 38,081 | $156.28 | $ 5,951,108.28 |
| 07/20/2000 | 30,000 | $156.28 | $ 4,688,250.00 |
| 07/20/2000 | 25,000 | $156.28 | $ 3,906,875.00 |
| 07/20/2000 | 6,919 | $156.28 | $ 1,081,266.73 |
| 08/10/2000 | 75,000 | $147.88 | $11,090,625.00 |
| 12/18/2000 | 76,336 | $ 65.50 | $ 5,000,008.00 |
| 01/18/2001 | 200,000 | $ 80.13 | $16,025,000.00 |
| **Total** | **771,336** | | **$83,510,072.51** |

## Defendant Spreng

207.    During the Relevant Period, Director Defendant Spreng sold a total of 10,000 shares of AMCC common stock, accumulating $40,935.00 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 10/31/2002 | 10,000 | $4.09 | $40,935.00 |
| **Total** | **10,000** | | **$40,935.00** |

## Defendant Stabenow

208.    During the Relevant Period, Director Defendant Stabenow sold a total of 65,000 shares of AMCC common stock, accumulating $6,833,750.25 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 01/21/1999 | 17,500 | $45.21 | $   791,250.25 |
| 01/22/1999 | 7,500 | $44.00 | $   330,000.00 |
| 01/29/1999 | 20,000 | $41.13 | $   822,500.00 |
| 02/24/2000 | 20,000 | $244.50 | $4,890,000.00 |
| **Total** | **65,000** | | **$6,833,750.25** |

## Defendant Sudireddy

209.    During the Relevant Period, Option Defendant Sudireddy sold a total of 674,795 shares of AMCC common stock, accumulating $59,423,660.57 in proceeds.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 04/27/1999 | 20,860 | $53.05 | $1,106,533.30 |
| 04/29/1999 | 5,560 | $50.44 | $  280,432.50 |
| 04/30/1999 | 5,120 | $52.44 | $  268,480.00 |
| 05/03/1999 | 8,200 | $53.94 | $  442,287.50 |
| 05/04/1999 | 10,260 | $54.13 | $  555,367.64 |
| 07/22/1999 | 25,000 | $84.02 | $2,100,470.00 |
| 10/29/1999 | 40,000 | $ 73.77 | $ 2,950,624.00 |
| 01/21/2000 | 10,000 | $152.19 | $ 1,521,875.00 |
| 01/21/2000 | 10,000 | $157.31 | $ 1,573,125.00 |
| 02/04/2000 | 5,579 | $179.25 | $ 1,000,035.75 |
| 02/04/2000 | 5,000 | $185.81 | $   929,062.50 |
| 02/22/2000 | 5,000 | $221.24 | $ 1,106,187.50 |
| 02/23/2000 | 5,000 | $226.91 | $ 1,134,531.50 |
| 02/25/2000 | 5,000 | $263.31 | $ 1,316,562.50 |
| 05/05/2000 | 5,000 | $116.81 | $   584,062.50 |
| 05/05/2000 | 5,000 | $116.81 | $   584,062.50 |
| 05/08/2000 | 5,000 | $105.94 | $   529,687.50 |
| 05/08/2000 | 5,000 | $105.94 | $   529,687.50 |
| 05/16/2000 | 10,000 | $110.81 | $ 1,108,125.00 |
| 05/16/2000 | 10,000 | $110.81 | $ 1,108,125.00 |
| 05/17/2000 | 5,000 | $109.94 | $   549,687.50 |
| 05/17/2000 | 5,000 | $109.94 | $   549,687.50 |
| 05/31/2000 | 10,000 | $101.44 | $ 1,014,375.00 |
| 05/31/2000 | 10,000 | $101.44 | $ 1,014,375.00 |
| 07/17/2000 | 15,000 | $162.44 | $ 2,436,562.50 |
| 07/20/2000 | 5,000 | $160.31 | $   801,562.50 |
| 07/24/2000 | 20,000 | $162.72 | $ 3,254,376.00 |
| 08/07/2000 | 10,000 | $144.56 | $ 1,445,625.00 |
| 08/08/2000 | 10,000 | $147.38 | $ 1,473,750.00 |
| 08/09/2000 | 10,000 | $156.13 | $ 1,561,250.00 |
| 08/10/2000 | 13,681 | $147.88 | $ 2,023,077.88 |
| 08/11/2000 | 10,000 | $149.44 | $ 1,494,375.00 |
| 08/14/2000 | 5,000 | $157.88 | $   789,375.00 |
| 08/16/2000 | 5,000 | $164.44 | $   822,187.50 |
| 08/30/2000 | 10,000 | $197.44 | $ 1,974,375.00 |
| 10/20/2000 | 20,000 | $194.31 | $ 3,886,250.00 |
| 10/23/2000 | 20,000 | $212.17 | $ 4,243,438.00 |
| 11/30/2000 | 60,000 | $ 48.30 | $ 2,898,126.00 |
| 12/18/2000 | 30,535 | $ 65.50 | $ 2,000,042.50 |
| 01/22/2001 | 40,000 | $ 81.94 | $ 3,277,500.00 |
| 02/05/2001 | 10,000 | $ 62.97 | $   629,688.00 |
| 02/11/2005 | 50,000 | $   3.73 | $   186,400.00 |
| 02/14/2005 | 25,000 | $   3.69 | $    92,125.00 |
| 02/15/2005 | 25,000 | $   3.81 | $    95,250.00 |
| 02/17/2005 | 25,000 | $   3.61 | $    90,125.00 |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

| | | | |
|---|---|---|---|
| 02/18/2005 | 25,000 | $ 3.63 | $ 90,750.00 |
| **Total** | **674,795** | | **$59,423,660.57** |

**Defendant Tullie**

210.   During the Relevant Period, Option Defendant Tullie sold a total of 633,568 shares of AMCC common stock, accumulating $54,553,989.63 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 05/07/1998 | 10,000 | $26.00 | $260,000.00 |
| 10/19/1998 | 10,000 | $20.34 | $203,438.00 |
| 10/20/1998 | 2,000 | $20.44 | $ 40,875.00 |
| 10/21/1998 | 13,000 | $20.98 | $272,688.00 |
| 10/21/1998 | 500 | $20.19 | $ 10,093.75 |
| 10/22/1998 | 17,500 | $20.87 | $365,156.75 |
| 10/23/1998 | 2,500 | $20.94 | $ 52,343.75 |
| 11/03/1998 | 5,000 | $25.44 | $ 127,187.50 |
| 11/06/1998 | 5,000 | $26.94 | $ 134,687.50 |
| 08/24/1999 | 20,000 | $95.43 | $ 1,908,626.00 |
| 02/23/2000 | 5,000 | $229.94 | $ 1,149,687.50 |
| 02/24/2000 | 5,000 | $244.94 | $ 1,224,687.50 |
| 04/25/2000 | 50,000 | $101.22 | $ 5,061,000.00 |
| 08/11/2000 | 25,000 | $152.88 | $ 3,821,875.00 |
| 08/11/2000 | 20,521 | $152.88 | $ 3,137,147.88 |
| 08/11/2000 | 5,000 | $149.94 | $ 749,687.50 |
| 08/14/2000 | 5,000 | $154.94 | $ 774,687.50 |
| 08/15/2000 | 5,000 | $161.13 | $ 805,625.00 |
| 08/16/2000 | 5,000 | $164.44 | $ 822,187.50 |
| 08/16/2000 | 5,000 | $164.63 | $ 823,125.00 |
| 09/06/2000 | 1,170 | $179.05 | $ 209,484.87 |
| 10/23/2000 | 20,000 | $211.00 | $ 4,220,000.00 |
| 01/10/2001 | 100,000 | $68.44 | $ 6,843,750.00 |
| 01/18/2001 | 200,000 | $80.13 | $16,025,000.00 |
| 02/01/2001 | 50,000 | $70.22 | $ 3,510,940.00 |
| 02/12/2001 | 46,377 | $43.13 | $ 2,000,008.13 |
| **Total** | **633,568** | | **$54,553,989.63** |

**Defendant Winner**

211.   During the Relevant Period, Option Defendant Winner sold a total of 125,000 shares of AMCC common stock, accumulating $10,415,000.00 in proceeds.

| Date | # of Shares Sold | Price per Share | Proceeds |
|---|---|---|---|
| 01/18/2001 | 40,000 | $81.50 | $ 3,260,000.00 |
| 01/18/2001 | 40,000 | $82.00 | $ 3,280,000.00 |
| 01/24/2001 | 20,000 | $87.00 | $ 1,740,000.00 |

| 01/24/2001 | 15,000 | $85.00 | $ 1,275,000.00 |
| 01/24/2001 | 10,000 | $86.00 | $   860,000.00 |
| **Total** | **125,000** | | **$10,415,000.00** |

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

212.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of Defendants' breaches of their fiduciary duties, statutory violations, and unjust enrichment, alleged herein.  The Company is named as Nominal Defendant solely in a derivative capacity.

213.    Plaintiffs are owners of AMCC common stock and were owners of AMCC common stock at all times relevant hereto.

214.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

215.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against the Defendants.  Such a demand would have been a futile, wasteful and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

216.    At the time this action was commenced, the Board consisted of eight directors: Director Defendants Cesaratto, Hooshmand, Goldman, Shlapak, Stabenow, Sullivan, White and Wright.   As set forth below, none of these Director Defendants were or are capable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

     a.     Cesaratto is, upon information and belief, directly interested in the conduct at issue because, as a member of the Compensation Committee at relevant times, he directly participated in and approved the backdating of stock options and is substantially likely to be held liable for breaching his fiduciary duties as alleged herein;

     b.     Hooshmand is, both as an officer and director, upon information and belief, directly interested in the conduct at issue because he received improperly backdated stock option grants.  Also, as a director, CEO and President at various times throughout the Relevant Period, he directly participated in and knowingly approved the Company's backdating of stock options and filing of false financial statements and other false SEC filings, as alleged herein and therefore is substantially likely to be held liable for the misconduct complained of herein;

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

c.   Goldman is, upon information and belief, directly interested in the conduct at issue because as a member of the Compensation Committee at relevant times, he directly participated in and approved the backdating of stock options and is substantially likely to be held liable for breaching his fiduciary duties as alleged herein;

d.   Shlapak is, upon information and belief, directly interested in the conduct at issue because he was a member of the Board during the relevant times when it approved backdated options for AMCC insiders, and is substantially likely to be held liable for breaching his fiduciary duties;

e.   Stabenow is, as a director and member of the Audit and Compensation Committees during relevant times, directly participated in and approved backdated options for AMCC insiders. Stabenow also approved the filing of false financial statements and other false SEC filings, which failed to properly account for the Company's backdating of stock options, and is substantially likely to be held liable for the misconduct complained of herein;

f.   Sullivan, as a director and member of the Audit Committee during relevant times, directly participated in and knowingly approved the backdating of stock options and filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

g.   White, as a director, Chairman of the Audit Committee, and member of the Compensation Committee during relevant times, directly participated in and approved backdated options for AMCC insiders and also approved the filing of false financial statements and other false SEC filings, which failed to properly account for the Company's backdating of stock options, and is substantially likely to be held liable for the misconduct complained of herein; and

h.   Wright, as a director and a Compensation Committee member, permitted the Company to backdate stock options issued to the Option Defendants in breach of his fiduciary duties and in direct violation of the stock option plans, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.

217.   Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Board and incapable of ratification by the current Board.   The Director Defendants are subject to liability for breaching their fiduciary duties to AMCC by, *inter alia*, failing to adequately monitor AMCC's financial reporting, and to detect, prevent and/or halt the accounting misstatements complained of herein.

218.   Furthermore, demand is excused because the misconduct complained of herein was

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

not, and could not have been, an exercise of good faith business judgment. As represented in AMCC's Proxy Statements, "each executive officer's compensation package is … designed to align the long-term interests of the executive officer with those of the Company's stockholders." However, by granting options with backdated exercise prices, Defendants undermined the purpose of the stock option plans by awarding Company insiders compensation that had intrinsic value regardless of AMCC's performance. In effect, this practice was nothing more than secret handouts to Company insiders at the expense of unsuspecting shareholders and the market at large.

219. The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected AMCC to potentially massive liability. Based on AMCC's internal investigation, the Company admitted to backdating option grants and announced that it would restate its previously issued financial statements due to errors in accounting for compensation expenses. AMCC will likely suffer tax liabilities for the additional compensation it will have to expense, is already in the process of being de-listed due to its inability to file current financial statements, and has had its reputation tarnished in the investment community through this deliberate and calculated conduct.

220. Finally, demand is excused because members of the Board are conflicted and entangled with certain of the other Defendants, preventing them from fairly considering, let alone taking, all necessary and proper action on the Company's behalf. Specifically:

    a. Defendants Cesaratto and Shlapak are both directors of Gennum. Cesaratto has been a director of Gennum and a member of the Compensation Committee of Gennum since April 2002, and Shlapak has served as a director of Gennum and a member of the Human Resources Committee of Gennum since April 2004.

    b. Defendants Cesaratto, Goldman, Shlapak, Sullivan, White, Hooshmand and Wright have all served as board members of Network Systems Design, and upon information and belief, did so during the same or overlapping time periods.

    c. Defendants Little and Smith both served as directors at Entridia Corporation, and upon information and belief, did so during the same or overlapping time periods.

    d. Defendants Goldman, Shlapak, Wilkie, Rickey, Gal and Smith all held various executive positions at Motorola during the same or overlapping time periods. Goldman served as an executive at

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

Motorola from July 1969 to January 1997. Shlapak was also an executive there from 1970 until February 2004. Wilkie was an executive from 1979 until 2004. Gal served as Director, Product Development at Motorola from September 1994 until December 1996. Smith was also employed by Motorola, and upon information and belief, did so during the same or overlapping time periods. In addition, Rickey was a director of Magis Networks, Inc., of which Motorola was a primary investor in 2002.

e.    Defendants Cesaratto, Rickey and Smith all held various executive positions at Nortel, and upon information and belief, were employed by Nortel during the same or overlapping time periods.

f.    Defendants Bendush, Winner and Clark all held various executive positions at Silicon Systems during the same or overlapping time periods. Bendush served as Senior Vice President and CFO from 1985 until 1999. Winner was Vice President of Product Development from 1982 until 1999, and Clark was the Director of Technology from 1990 until 1995.

g.    Defendants Stabenow, Clark and Bedi all held various executive positions at National Semiconductor, and upon information and belief, were employed by National Semiconductor during the same or overlapping time periods.

h.    Defendants Wright, Rickey, Winner and Gal all held various engineering and management positions at IBM and, upon information and belief, were employed by IBM during the same or overlapping time periods. Wright was employed at IBM from 1976 until 1987, Rickey from 1981 until 1985, and Gal from 1981 until 1982.

i.    Upon information and belief, Defendant Sullivan was employed as a professor at UCSD Rady School of Management during the same time period in which Defendant White endowed a chair at the Rady School.

j.    Defendants Hooshmand, Lau and Rickey all held senior positions with Cisco and upon information and belief, were employed by Cisco during the same or overlapping time periods. Hooshmand served as a Vice President at Cisco from 1996 until coming to AMCC in March 2005, and Lau worked at Cisco from 1992 until October of 1999.

k.    Defendant Smullen was a member of the Board of Directors of Micro Linear Corporation during fiscal 1998 and 1999, during which time period Defendant Stabenow served as the Chairman, President and CEO of Micro Linear Corporation.

l.    Both Defendants Raza and Spreng are currently directors of Mellanox, Inc.

m.    Upon information and belief, Defendants Wright and Lau served at

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

Amdahl in executive positions and were employed by Amdahl during the same or overlapping time periods. Wright served as President and CEO at Amdahl from 1987 until October 2000, and Lau was employed at Amdahl until 1992.

n.   Defendants Raza and Rickey served at NexGen in executive positions. Raza served as CEO, founder and Chairman from September 1988 through January 1996, and Rickey served as Vice President Operations from May 1995 through February 1996.

o.   Defendants Murphy and Pairman have both served in management positions at Adaptec, and upon information and belief, were employed by Adaptec during the same or overlapping time periods.

221.   Furthermore, as noted in a July 26, 2006 *New York Times* article titled "Turning Back the Clock on Backdating," the Company's internal investigation itself is conflicted – "Amazingly, the company has appointed one of the men who sat on the compensation committee from 1999 to 2004 – Harvey P. White, a Qualcomm founder – to lead the company's internal investigation into backdating."

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

222.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

223.   Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

224.   The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxies filed on June 15, 1998, June 23, 1999, July 10, 2000, July 12, 2001, July 10, 2002, July 17, 2003, July 16, 2004, July 11, 2005, and April 16, 2005, which misrepresented or failed to disclose material facts including, *inter alia*, the fact that Defendants were causing the Company to engage in an option backdating scheme, a fact which Defendants were aware of and participated in.

225.   Through the exercise of reasonable care, Defendants should have known that the

1  Proxy Statements were materially false and misleading.

2      226.    By reasons of the conduct alleged herein, each Director Defendant violated Section

3  14(a) of the Exchange Act.  The Proxy Statements were an essential link in the accomplishment of

4  the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the

5  truth would have immediately thwarted a continuation of shareholders' endorsement of the

6  directors' positions, the executive officers' compensation, and the Company's compensation

7  policies.

8      227.    The Company was damaged as a result of the material misrepresentations and

9  omissions in the Proxy Statements, and the information would have been material to the

10  Company's shareholders in determining whether to elect directors to manage their Company.

11      228.    Plaintiffs, on behalf of the Company, thereby seek to void the election of Director

12  Defendants based upon the misleading and incomplete proxy materials, and to recover damages

13  caused by Defendants' failure to disclose the improper compensation described herein.

**COUNT II**

**Against the Director Defendants for
Violations of §20(a) of the Exchange Act**

16      229.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

17  above, as though fully set forth herein.

18      230.    The Director Defendants, by virtue of their positions with AMCC and their specific

19  acts, were, at the time of the wrongs alleged herein, controlling persons of AMCC within the

20  meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the

21  same to cause AMCC to engage in the illegal conduct and practices complained of herein.

**COUNT III**

**Against All Defendants for Accounting**

24      231.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

25  above, as though fully set forth herein.

26      232.    At all relevant times, Defendants, as directors and/or officers of AMCC, owed the

27  Company and its shareholders fiduciary duties of good faith, care, candor, and loyalty.

28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

233.     Through the breach of their fiduciary duties owed to AMCC and its shareholders, Defendants caused AMCC, *inter alia*, to grant backdated stock options to themselves and/or certain other officers and directors of AMCC.  By this wrongdoing, the Defendants breached their fiduciary duties owed to AMCC and its shareholders.

234.     The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Option Defendants.

235.     As a result of Defendants' misconduct, AMCC has been substantially injured, damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

236.     Plaintiffs demand an accounting be made of all stock option grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Option Defendants.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty and/or Aiding and Abetting

237.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

238.     The Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties they owed to the Company.

239.     The Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

240.     The Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, candor, independence and supervision owed to AMCC and its public shareholders.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

241.   Each of the Defendants authorized, or by abdication of duty, permitted the stock options granted to the Option Defendants to be backdated, and failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

242.   As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

243.   The Company has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of the Company, seek damages and other relief for the Company, in an amount to be proven at trial.

## COUNT V

### Against All Defendants for Constructive Fraud

244.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

245.   As corporate fiduciaries, Defendants owed to AMCC and its shareholders a duty of candor and full accurate disclosure regarding the true state of AMCC's business and assets and their conduct with regard thereto.

246.   As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from AMCC's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of AMCC.  Thus they have committed constructive fraud and violated their duty of candor.

247.   By reason of the foregoing, AMCC has been damaged.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

## COUNT VI

### Against All Defendants for Corporate Waste

248.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

249.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of AMCC, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

250.    All the payments and benefits provided to the Defendants were at the expense of AMCC.  The Company received no benefit from these payments, and AMCC was damaged by such payments.

251.    Certain Defendants sold AMCC stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of AMCC. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT VII

### Against All Defendants for Gross Mismanagement

252.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

253.    By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

254.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.

255.    As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

**COUNT VIII**

**Against the Option Defendants for
Unjust Enrichment and Breach of the Duty of Loyalty**

256.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

257.    As a result of the conduct described above, the Option Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company, in the form of unjustified salaries, stock option grants, benefits, bonuses, and other emoluments of office.

258.    All the payments and benefits provided to the Defendants were at the expense of AMCC.  The Company received no benefit from these payments, and AMCC was damaged by such payments.

259.    Certain Defendants also sold AMCC stock for a profit during the period of deception, misusing confidential non-public corporate information.

260.    Accordingly, this Court should order the Option Defendants to disgorge all profits, benefits and other compensation obtained by the Option Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Option Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.  A constructive trust for the benefit of the Company should be imposed thereon.

**COUNT IX**

**Against the Option Defendants for Rescission**

261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

262.    As a result of the acts alleged herein, the stock option contracts between the Option Defendants and AMCC entered into during the Relevant Period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

filed contracts regarding the Option Defendants' employment agreements and the Company's stock option plan, which was also approved by AMCC shareholders and filed with the SEC.

263.    All contracts, which provide for stock option grants between the Option Defendants and AMCC and were entered into during the Relevant Period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Option Defendants for Breach of Contract

264.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

265.    As a result of the backdating of options granted to them, the Option Defendants have breached their employment agreements with AMCC and violated the Company's stock option plan, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for AMCC stock, on the date of the grant.

266.    AMCC and its shareholders have been damaged by the Option Defendants' breach of contract.

## COUNT XI

### Against the Insider Selling Defendants for
### Violation of California Corporation Code §25402

267.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

268.    At the time that the Insider Selling Defendants sold their AMCC common stock as set forth herein at ¶192, by reason of their high executive and/or directorial positions with AMCC, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of AMCC's option backdating, improper accounting, and false financial statements.

269.    At the time of such sales, that information was not generally available to the public

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

or the securities markets. Had such information been generally available, it would have significantly reduced the market price of AMCC shares at that time.

270. The Insider Selling Defendants had actual knowledge of material, adverse non-public information and thus sold their AMCC common stock in California in violation of California Corporations Code §25402.

271. Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants are liable to AMCC for damages in an amount up to three times the difference between the price at which AMCC common stock was sold by these defendants and the market value which AMCC common stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT XII

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

272. Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

273. At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above and sold AMCC common stock on the basis of such information.

274. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AMCC common stock.

275. At the time of their stock sales, the Insider Selling Defendants knew that the Company's net income was materially overstated. Defendants' sales of AMCC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

276. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO. 5:06-cv-04269-RS

1  of a constructive trust on any profits Defendants obtained thereby.

2  <u>**PRAYER FOR RELIEF**</u>

3  WHEREFORE, Plaintiffs demand judgment as follows:

4      A.      Against all of the Defendants and in favor of the Company for the amount of

5  damages sustained by the Company as a result of Defendants' misconduct;

6      B.      Ordering the Option Defendants to disgorge to the Company all of the backdated

7  stock options they received, including the proceeds of any such options that have been exercised,

8  sold, pledged, or otherwise monetized, and imposing a constructive trust thereon;

9      C.      Awarding the Company treble damages as provided by California Corporations

10  Code §25502.5;

11      D.      Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary

12  duties;

13      E.      Awarding to Plaintiffs, the costs and disbursements of the action, including

14  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

15      F.      Granting such other and further relief as the Court deems just and proper.

16  <u>**JURY DEMAND**</u>

17      Plaintiffs demand a trial by jury on all claims so triable.

18  DATED: October ___5___, 2006          WOLF HALDENSTEIN ADLER
                                              FREEMAN & HERZ LLP
19                                          FRANCIS M. GREGOREK
                                            BETSY C. MANIFOLD
20                                          FRANCIS A. BOTTINI, JR.
                                            RACHELE R. RICKERT
21

22                                          _Rachele R. Rickert_

23                                          _____
                                                RACHELE R. RICKERT
24
                                            750 B Street, Suite 2770
25                                          San Diego, CA 92101
                                            Telephone: 619/239-4599
26                                          Facsimile:  619/234-4599

27

28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF JACOB T. FOGEL, P.C.
JACOB T. FOGEL
32 Court Street – Suite # 602
Brooklyn, New York 11201

Attorneys for Plaintiff Pinchus Berliner

GAINEY & McKENNA
THOMAS J. McKENNA
295 Madison Avenue, 4th Floor
New York, NY 10017
Telephone:  212/983-1300
Facsimile:   212/983-0383


Attorneys for Plaintiff Francesco Ciabatti

AMCC:14013.CPT

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

## **DECLARATION OF SERVICE**

I, MAUREEN LONGDO, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San Diego, California. 92101.

2.      That on October 5, 2006, declarant served the CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT via the CM/ECF System to the parties so indicated on the attached service list, who are registered participants of the CM/EMF System.

3.      That on October 5, 2006, 2006, declarant served the parties so indicated on the attached service list, who are not registered participants of the CM/ECF System, via U.S. Mail.

4.      That there is regular communication by U. S. Mail between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of October 2006, at San Diego, California.

_____
MAUREEN LONGDO

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
LEAD CASE NO.  5:06-cv-04269-RS

AMCC
Service List – October 5, 2006
Page 1

COUNSEL FOR PLAINTIFF

Francis M. Gregorek
Betsy C. Manifold
Francis A. Bottini, Jr.
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
       619/239-4599
       619/234-4599 (fax)

\*  Jacob T. Fogel
   LAW OFFICES OF JACOB T. FOGEL, P.C.
   32 Court Street – Suite # 602
   Brooklyn, New York 11201

   Attorneys for Plaintiff Pinchus Berliner

\*  Thomas J. McKenna
   GAINEY & McKENNA
   295 Madison Avenue, 4th Floor
   New York, NY 10017
       212/983-1300
       212/983-0383 (fax)

   Attorneys for Plaintiff Francesco Ciabatti

COUNSEL FOR DEFENDANTS

\*\* Daniel W. Turbow
   Douglas J. Clark
   Erin J. Holland
   WILSON SONSINI GOODRICH
     & ROSATI
   PROFESSIONAL CORPORATION
   650 Page Mill Road
   Palo Alto, CA 94304-1050
       650/493-9300
       650/565-5100 (fax)

Attorneys for Defendants David M. Rickey,
Joel O. Holliday, Thomas Tullie, Anil Bedi,
Laszlo Gal, William E. Bendush, Kenneth L.
Clark, Brent E. Little, Gregory A. Winner,
Cesar Cesaratto, Kambiz Hooshmand, Murray
A. Goldman, Fred Shlapak, Arthur B.
Stabenow, Julie H. Sullivan, Harvey P. White
and David B. Wright and Nominal Defendant
Applied Micro Circuits Corporation

\*        Via United States Mail Only
\*\*       Via CM/ECF Only